UNITED STATES of America,
Appellant,

v.

William H. KELLY, Appellee.

No. 15492.

United States Court of Appeals
Eighth Circuit.

Aug. 20, 1956.

Richard M. Markus, Atty., Dept. of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Clinton G. Richards, U. S. Atty. Sioux Falls, S. D., and Samuel D. Slade, Atty. Dept. of Justice, Washington, D. C., were with him on the brief), for appellant.

Norman K. Blatchford, Hot Springs, S. D., for appellee.

Before SANBORN, WOODROUGH and VOGEL, Circuit Judges.

WOODROUGH, Circuit Judge.

William H. Kelly brought this action against the United States for damages under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), alleging that government employees at the Veterans Administration Hospital at Hot Springs, South Dakota, acting within the scope of their employment, negligently placed poisonous substances in the "edible garbage" sold by the government to Mr.

Kelly for use as feed for his hogs, and that such negligence directly and proximately caused the death of seven head of plaintiff's cattle to his damage in the sum of $2172, under circumstances where the United States, if a private party, would be liable to the claim for such damage. On the trial of the case to the court without a jury, the court accompanied its findings and conclusions with opinion, and rendered judgment for plaintiff against the government in the sum of $2130.00 and costs. The government appeals. Its defenses are that the negligence complained of was not the proximate cause of the damage; that the plaintiff was contributorily negligent; that he assumed the risk; and that provisions of the contract of sale of the edible garbage to Mr. Kelly bar his recovery.

The parties agree upon a statement of the evidence as follows:

On May 12, 1953, the Veterans Administration Supply Office at Hot Springs, South Dakota, issued an invitation for bids for the "Sale of Edible Garbage for the period July 1, 1953 to June 30, 1954, both dates inclusive." On the face of the invitation, the property was described as 'Edible Garbage free from excess moisture, nonedible garbage and foreign matter (bottles, cans, ashes, etc.)." The description indicated that the garbage would "average 300 lbs. daily" but indicated that the sale was "without guarantee as to exact weight." Beneath the description were the printed words "Caution, Inspect The Property" and a notation of the time and place where it could be inspected.

The terms and conditions of the sale were indicated on the reverse side of the invitation and an additional typewritten sheet. Paragraph 2 on the back of the invitation refers to the "Condition of Property:"

"All property listed herein is offered for sale 'as is' and 'where is', and without recourse against the Government. * * * The description is based on the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to the quantity, kind, character, quality, weight, size or description of any of the property, or its fitness for any use or purpose, and no claim will be considered for allowance or adjustment or for rescission of the sale based upon the failure of the property to correspond with the standard expected; this is not a sale by sample."

Paragraph 11 of the printed terms is entitled "Limitation on Government Liability:"

"In any case where liability of the Government to the purchaser has been established, the extreme measure of the Government's liability shall not, in any event, exceed the refund of the purchase price or such portion thereof as the Government may have received."

Paragraph 2 of the typewritten supplemental terms requires the purchaser to cook all garbage collected at 145 degrees F. for 30 minutes before feeding the garbage to the swine in order to prevent the spread of vesicular exanthema. And paragraph 6 of the typewritten sheet established the terms and conditions of the invitation as the contract, upon acceptance of a bid.

Appellee filed a bid of $5.00 per month, or a total of $60.00 for the twelve month period. In due course on May 29, 1953, that bid was accepted so that the terms and conditions stated in the invitation for bids became a binding contract between appellee and the Government. This was approximately the fifth year for which appellee has been awarded the contract for removal of edible garbage from the hospital. When he first began collecting garbage from the hospital, the dietician showed him where the containers involved were stored and which containers held the garbage that he should take. Although, during the period in which he obtained garbage from the hospital, he occasionally found foreign nonedible material in the designated containers, he still considered this

garbage as the highest quality feed available for his swine. When he found cans, broken dishes, and similar material in the refuse containers, he would nevertheless feed the garbage to his hogs after discarding such foreign material. There is no indication that he ever complained to the hospital personnel when the nonedible substances were discovered.

On July 13, 1953, appellee made the customary collection at the hospital. He removed three or four 30 gallon containers from the garbage storage room and proceeded to transfer their contents to cans on his pickup truck. In emptying the hospital's containers, he noticed a thick grey liquid intermixed with the food refuse in one of them. At the time he believed it was wet plaster, but in fact it was a high lead content substance that had been removed from refrigerator drip trays and placed in the garbage container by hospital employees who had no knowledge of its chemical composition. As on previous occasions when he had discovered nonedible material in the garbage, appellee made no protest to hospital personnel and no inquiry there or elsewhere as to its nature.

He then took the garbage to the small farm which he maintained 12 miles outside Hot Springs. On his farm, which he tended when not occupied with his other business of selling cars in Hot Springs, he had 16 holstein cows and calves, 1 steer, several sheep, and the swine for which he had purchased the garbage. Believing the foreign substance found in the contaminated can might damage or coat his cooker, appellee decided not to cook it and not to feed it to his pigs. He therefore proceeded to discard it by emptying the can in a small washout, about 220 yards from his cooker, which was inside the pasture fence that enclosed the grazing area for his cattle. Several of his cows and steers ate a portion of the contaminated garbage; 6 cows and the steer died from lead poisoning.

When he first noticed that his cattle were ill, appellee contacted a veterinarian, Dr. Ivy, who examined the sick cows that evening. The veterinarian's preliminary diagnosis was that the cattle had eaten some substance poisonous to their system, so he recommended that he and appellee look for such material in the pasture. At Mr. Kelly's suggestion, one of the places where they first looked was the situs of the discarded contaminated garbage. Dr. Ivy originally believed that the foreign substance intermixed with the garbage was wet plaster but he later determined that it was the source of the poisonous material. After one cow died, on the subsequent day, Dr. Ivy performed an autopsy, and on the basis of examination, he concluded that the cows were suffering from a heavy metal poison. Returning to the situs of the contaminated garbage, appellee took a sample can-full of the foreign substance and buried the rest. Six additional cattle died, and each was left lying on the spot where it died.

### Opinion.

#### As to Proximate Cause.

The court found that the substance cleaned from the drip trays of the refrigerating coils in the hospital kitchen and placed into one of the cans provided for the edible garbage purchased by plaintiff contained lead and was poisonous and caused the death of plaintiff's seven head of cattle. That the government's servants failed to exercise ordinary care and skill and were negligent in dumping the poisonous substance into the edible garbage sold to plaintiff and that their negligence was the direct and proximate cause of the damage. That the plaintiff was not contributorily negligent.

The government does not attack the finding that its servants were negligent. It argues that the negligent poisoning of the garbage merely created a condition, and then, when plaintiff threw away the garbage containing the poisonous matter into the wash where his cattle got at it, his acts were the proximate cause of the deaths. That the court erred as a matter of law in holding otherwise.

But the fact that the garbage had poison in it was not apparent to the plaintiff. He had no reason to anticipate or suspect that anyone had put poisonous matter into the edible garbage the government was selling him. He saw stuff that looked as though it would coat up his cooker and on that account he threw away the can of garbage where it was. If reasonable minds would differ on whether or not he used reasonable care, determination was for the trier of the facts. But plaintiff had no such knowledge or notice of danger as to be chargeable with negligence as a matter of law.

The law of South Dakota, as elsewhere, is well settled that where, as in the situation here presented, one commits a wrongful act that should reasonably cause him to anticipate injury from it, he is not relieved from the liability for the injury, although some cause, which alone would not have produced the injury, cooperates with the wrongful act to bring it about. Wallace v. Brende, 67 S.D. 326, 292 N.W. 870; Krumvieda v. Hammond, 71 S.D. 544, 27 N.W.2d 583, both citing Johnson v. Mallory, 123 Neb. 706, 243 N.W. 872.

The court was not in error in its decision that the negligence of the government's servants, acting within the scope of their employment, was the proximate cause of plaintiff's damage.

### As to Plaintiff's Alleged Contributory Negligence.

■ The evidence was that, although Mr. Kelly had fed the government's edible garbage to his hogs for five years, no damage had been occasioned to his stock from foreign matter contained in it. He made no close or particular examination of the can of it which he threw away. Beyond thinking that the material, resembling plaster in appearance, might damage his cooker, he had no reason to be and was not fearful of it. He had no notice or knowledge of poisonous substance in it. The question, therefore, was simply whether he acted with reasonable care under all the circumstances, and that was for the court. The court's determination that plaintiff was not guilty of contributory negligence was not clearly erroneous.

### As to Assumption of Risk.

■ The government relies for defense on the provisions of the contract of sale that property listed as "edible garbage" was offered for sale "as is" and "without recourse on the Government" and that "the Government makes no guaranty, warranty, or representation, expressed or implied, as to the quantity, kind, character, quality, weight, size, or description of any property, or its fitness for any purpose * * *." It is contended that by reason of these provisions, the buyer assumed the risk of having poisonous substances placed in the edible garbage sold and delivered to him.

It is unnecessary to follow out the effect of these provisions in the many situations to which they have been applied. 46 Am.Jur.Sales, Section 319. In this case the government sold and the plaintiff bought edible garbage over the period of five years for which plaintiff agreed to and did pay in money and in services. The disclaimer of warranties and guarantees and provisions as to taking the goods "as is" are all consistent with the sales contract for edible garbage so made and carried on in good faith. But we are cited to no case in which such provisions are held to excuse or constitute a defense to such a tortious act as placing poisonous matter in feedstuff which is the subject of the contract of sale. A duty rests upon a seller making delivery to use reasonable care. Wright v. Howe, 46 Utah 588, 150 P. 956, L.R.A.1916B, 1104; Provost v. Cook, 184 Mass. 315, 68 N.E. 336. We find no error in the ruling of the court on this issue.

### As to Paragraph 11 of the Contract of Sale of Edible Garbage

■ The wording of the paragraph is very general. Its language that the government's liability to the purchaser of the edible garbage shall be limited

"In any case where liability of the Government to the Purchaser has been established" is broad enough so that it could be argued, if taken literally, that if one of the government trucks should negligently run into the purchaser and cause him damage to the extent of $100,000, "the extreme measure of the Government's liability shall not, in any event, exceed refund of the purchase price * * *." ($5.00 a month for a year.) To so interpret the provision would manifestly cause an unintended overreaching by the government.

The trial court declared in its opinion that the paragraph does not cover and was not intended to cover liability for negligence of the defendant, and we are in accord with that declaration to the extent that it does not cover and was not intended to cover such an act of negligence of the defendant as putting foreign poisonous matter into the edible garbage that was the subject of the sale contract.

It has been said that the government may contract for exculpation of its future negligence, Rushford v. United States, 2 Cir., 204 F.2d 831; Air Transport Associates v. United States, 9 Cir., 221 F.2d 467, but we need express no opinion on that in view of our conclusion that such was not the purpose or intention of paragraph 11 in this case. The paragraph is one of the many provisions of the standard printed form of contract of sale of property. Its subject matter is sales and not torts. When it speaks of "any case of liability of the Government to the Purchaser", it must generally and without more be taken to refer to liability for breach of the contract, which is the transaction intended to be covered by the writing, and not to liability for torts under the Tort Claims Act.

An illuminating discussion concerning interpretation and application of exculpatory clauses in contracts is found in the opinion handed down by the Supreme Court last year in Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911. The majority decision was that a tugboat may not validly contract against all liability for its own negligent towage, but it is clearly recognized throughout the extended discussion, carried on in three opinions, that, in English Law "just as has been true of decisions in this country * * * specific language directed at liability for negligence must be used." 349 U.S. at page 115, 75 S.Ct. at page 646. (Frankfurter, J., dissenting.)

We find no error in the judgment appealed from.

Affirmed.

SANBORN, Circuit Judge (concurring).

In order to prevail on this appeal, the Government would have to demonstrate that, under South Dakota law, a private individual, under a similar contract and under similar circumstances, would not have been liable for the loss sustained by Kelly. The tort liability of the Government depends upon whether a private person would be liable under like circumstances "in accordance with the law of the place where the act or omission occurred." Federal Tort Claims Act, 60 Stat. 842, 844, 63 Stat. 62, Title 28 U.S. C.A. § 1346(b).

I think it is unnecessary to rule that, as a matter of general law, the contract provisions upon which the Government relies for a reversal were not intended to cover negligence in the performance of a contract such as that in suit. It seems to me that all that need be said in this case is that the issues of negligence and contributory negligence were clearly issues of fact for the trial court, and that the issues of assumption of risk and limitation of liability, under the terms of the contract, were doubtful questions of local law as to which the trial court reached a permissible conclusion. Citizens Insurance Co. of New Jersey v. Foxbilt, Inc., 8 Cir., 226 F.2d 641, 643 and cases cited.

I agree that the judgment appealed from should be affirmed.