DAY & ZIMMERMANN, Inc.

DAY & ZIMMERMANN, INC.

v.

BLOCKED IRON CORPORATION OF AMERICA.

Civ. A. No. 23161.

United States District Court
E. D. Pennsylvania.
Oct. 9, 1961.

Lewis H. Van Dusen, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

H. Francis De Lone, Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

Day & Zimmerman, Inc., industrial engineers, brought this suit for a balance due it (fixed by the Court at $184,413.01) on a contract to design and construct a plant for Blocked Iron Corporation of America. BICOA counterclaimed for damages for defective performance. D&Z's liability upon the counterclaim has been determined in a separate trial, testimony in the trial upon the issue of damages has been taken, and the case is now before the Court for disposition of that issue. The nature of the contract and the obligations of the parties under it are fully discussed in the opinion filed after the earlier trial D.C., 200 F.Supp. 117.

D&Z was held liable by the Court because of defective performance in two respects: first, D&Z recommended and procured the purchase of a drying oven (the largest and most expensive piece of equipment in the plant) of inadequate heating capacity and, in so doing, failed to exercise the skill to be expected of an engineering firm; and, second, a portion of the floor of the oven-carbonator assemblage, the construction of which it undertook itself, developed cracks through which a large amount of carbon dioxide was alleged to have leaked out.

The damages claimed by BICOA consist of (1) money wasted in correcting the oven and its air circulating system amounting to $75,000., (2) income lost as a result of reduced production due to the insufficiency of the oven (claimed in the amount of nearly $700,000.), and (3) the value of carbon dioxide lost through cracks in the carbonator floor (claimed

directly in the amount of $11,076.20 and indirectly[1] in a very much larger amount).

(1)

It was stipulated that BICOA spent the sum of $75,000. in making revisions to correct the heat input and air circulation of the oven. This sum represents the additional cost incurred over and above what the oven would have cost had the changes been incorporated in it as originally installed or, in other words, money wasted as a result of the original error. Half of the amount was by the stipulation attributed to increasing the BTU input to the oven and the other half to increasing the air circulation.

D&Z has been found at fault in respect of the heat capacity of the oven, and it follows that it is liable for the $37,500. wasted in installing additional burners.

As to the second $37,500., the burners having been increased to the extent required, it was essential that the additional heat get to the blocks being dried in the oven. The system as originally designed did not have enough air circulation capacity to take care of a nearly threefold increase in the BTU input. Had the error as to the size and number of the burners been discovered at the time when the oven design was submitted to D&Z, the air circulation would undoubtedly have been increased accordingly by the manufacturer, if not by D&Z itself. Getting increased air circulation was a necessary part of the oven revision. Without it, increasing the heat input would have been futile.

 In view of the fact that the burners and air circulation equipment thus constitute a single heat distribution system, I find that D&Z is liable for the entire $75,000., representing money spent in increasing both.

1. For an explanation of the nature of the "indirect" claim see testimony of BICOA's process engineer dealing with Schedule I, column 11, together with footnote thereto. The indirect claim consists in reducing the theoretical cost of its theoretical lost production, by the value of the carbon dioxide alleged to have been lost.

### (2)

The largest part of BICOA's *allowable* damages consists of loss of profits [2] by reason of delay in getting the plant into full commercial production, the delay having been incurred in efforts to make the oven and air circulating equipment adequate.

 The principles governing the measure of damages in a case like the present one are concisely stated in the Restatement of Contracts, Sections 331 (1) and 346(1) (b).[3] These sections are in accord with the law of Pennsylvania upon the point. Section 346 states the measure for defective performance of a construction contract. The contract in the present case has been held to be not a construction contract (except as to the carbonator floor, BICOA's third claim for damages, supra) but one for professional services in connection with the construction of an industrial plant. However, although the rights and obligations of the parties under the two classes of contracts may be quite different, the loss occasioned by a breach consisting of defective performance resulting in delay but not in total failure to complete, will be about the same in both, and I think that BICOA can be properly recompensed for its losses by applying the measure of damages for breach of a construction contract, stated in 346(1) (b). Paraphrasing Comment c. under that subsec-

tion: If the engineering firm (builder) had reason to foresee that the product of the plant would be placed upon the market (put to a special use) and that substantial profits (an exceptional return) would be made, Section 346(1) (b) does not deny the owner of the plant (the other party) compensation measured by that profit (exceptional return); he can get judgment for the amount thereof if he can comply with the rule as to certainty of proof (Section 331).

As a matter of fact, BICOA's claim as set forth in the exhibit [4] in which it calculates its damages is not for damages for delay in getting into full production, but, although not so expressly stated, is in effect, for D&Z's failure to procure an oven which complied with the duty specifications which D&Z set up for Industrial Ovens, the manufacturer,[5] or, if not that, then the claim can only be a renewal of the "guarantee" theory of the contract which BICOA pressed in the earlier trial and which theory the Court did not adopt. BICOA contends that the plant has never been, and probably never will be[6], able to operate as it would have had an adequate oven been installed at the outset, not suggesting that an oven complying with the duty specifications would not have been adequate.

However, D&Z did not agree to procure an oven of any particular type, size, or capacity, nor did it guarantee the per-

2. Actually, BICOA claims not loss of profits but loss of *income*. I think that loss of profits is the proper measure in a case like this. As a matter of fact, in view of the fact that BICOA's claim as presented is for loss of *net* operating income, it will be not very different from loss of profits.

3. Sec. 331(1): "Damages are recoverable for losses caused or for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty."

 Sec. 346(1) (b): "For any delay in completion fairly chargeable to the builder, the plaintiff can get judgment for the value of the use of the product, if it was being constructed for use, and for the

decline in sale value, if it was being constructed for sale, in either case determined in accordance with the rules stated in § 331."

4. Schedule I.

5. See, for example, column headed "Low Block Weight" in Schedule I.

6. In the opinion heretofore filed, it was found that the plant "has been operating in commercial production since December, 1957, and, for at least the past two years, on a very profitable basis." [200 F.Supp. 118]. The Court also said, "In view of the record before me, I cannot say that it has been proved that this plant ultimately failed to have the 'rated capacity' mentioned in the contract, as that term was understood and interpreted by the parties."

formance of the oven in terms of any particular amount of production or in any other way. That last point has already been decided. The principal obligation assumed by it (as found by the Court in the earlier trial) was to use ordinary professional skill in engineering a plant for the production of blocked iron, described as of a certain "rated" capacity. When it did that, it complied with its contract obligation, and it is immaterial if the oven falls short of the specifications. It seems to me that BICOA is basing its claim upon the breach of an obligation or obligations which D&Z did not assume and as to which it is not in default.

In support of its claim BICOA has offered a carefully prepared exhibit (Schedule I). I have no doubt that, so far as it contains figures taken .from BICOA's books, Schedule I correctly shows the entries, which in turn are competent evidence of the facts which they record. However, most of it consists of conclusions drawn from the entries by BICOA's process engineer, the purpose being to show how much loss of production was due to oven deficiency (for which D&Z has been held liable) as distinguished from loss of production due to other causes (for which D&Z would not be liable). The matter is vital to proof of a case for lost profits. See Hood v. Meininger, 377 Pa. 342, 348–349, 105 A.2d 126.

Schedule I was objected to when offered in evidence but I do not exclude it. However, I do not accept the conclusions which constitute the bulk of it nor make them the basis for assessing damages. Entirely too much loss of revenue is attributed by it to the asserted fact that the blocks are (or were) not dried as they should be. It takes too little account of many factors which are of importance, such as market conditions in the steel industry which affect the demand for the product, the differences in the types of ore, in the particle sizes of the ores and in the materials used in the manufacture of the blocks, as well as other factors which affect production, some of which

are probably unknown, such as the original want and gradual acquisition of "know how" by BICOA's operating personnel.

The ascertainment of the amount of damages in accordance with the principles stated above will consist in finding answers to two questions of fact. They are, How long was BICOA delayed in getting into normal full scale commercial production by the insufficient heat input capacity of the oven? and How much profit was BICOA deprived of by such delay?

Before these questions are answered there is one point (expressly reserved in the opinion upon liability) which must be disposed of. It is whether D&Z's work on the revision of the oven-carbonator was "an additional breach of contract or a negligent prolongation of the damage period, or whether it represented reasonably skillful attempts to mitigate damages."

The matter must be considered in the light of the circumstances at the start-up of the plant in November 1956 when the parties were faced with the problem what to do about an oven incapable of doing the job required of it. It would have been an inexcusable economic waste to tear out the entire oven, which constituted an integral part of the plant, perhaps the main part, and replace it with an entirely new oven of different design. BICOA did not insist upon such a course but not only permitted but requested D&Z to continue with the work.

Sound engineering and economics required that every effort should be made to salvage as much of the installation as possible. The method adopted might be called a step-by-step approach. Admittedly, the art of drying materials is not an exact science and a great deal of trial and error goes into setting up and operating any successful drying process. What D&Z did was to make such changes as were obviously necessary in order to achieve the desired result, with the reasonable expectation that they would suffice, leaving it open to make such further changes as might appear necessary later

on. This approach was reasonable and proper, particularly with respect to a new and, to a certain extent, experimental process such as BICOA intended to carry out. D&Z's planning and supervision of the work of making the oven revisions have not been shown to have been in any way negligent.

I do not regard the changes which were made after the major revisions were completed as proving that the work up to that point had been negligent or that the time spent had been wasted. Changes in the revised oven undoubtedly were needed and were effective to improve production in the plant, but I do not think that D&Z can be charged with failing to exercise reasonable engineering skill because it did not incorporate the changes made later on into the revision, particularly as their desirability or necessity could not have appeared until the plant had been observed in full operation on a continuous basis.[7] Continuous operation was not seriously undertaken until shortly before D&Z left the job on August 1, 1957.

On the reserved point I, therefore, find that D&Z's performance under the contract, particularly in connection with the oven revisions, after its initial mistake, did not result in a negligent prolongation of the delay caused by the oven deficiency and did not involve an additional breach of the contract but was a reasonably skillful attempt to mitigate damages.

Having found that the plant as it now stands is, and for several years has been, capable of being operated in commercial scale production and of producing 1,000 tons a day, we reach the question, How much of the delay in bringing the plant to that condition must be attributed to D&Z's original default?

■ First, as to delays after July 4. I fix as a termination date for delay attributable to the original breach July 4, 1957, the day on which the major revisions of the oven were completed. It must be borne in mind that D&Z has been held liable for failure to exercise proper skill with respect to one thing only, namely, the heat input of the oven which it recommended. That deficiency was corrected on July 4. Had D&Z originally recommended and procured an oven in all respects the same as it stood on that date, there would have been no liability. This is evident from the fact that the oven has been operated in continuous and generally profitable commercial production ever since with the same burner capacity and the same recirculated air CFM (in the heated portion of the oven) which was installed during the revision. As a matter of fact, as being operated, it has one less heated zone, the last zone being devoted to cooling.

I am aware that some of the changes made after D&Z left the job were quite substantial,[8] but they must be regarded as the orderly and normal adjustments in and development of a new and untried process. Having brought the oven up to a point where the only further changes required were those for development and improvement of the process, D&Z's responsibility for its initial error terminated and delays occurring after July 4 cannot be charged to its fault.

■ How much of the delay before July 4, 1957, was occasioned by the error is the next question. The major revisions required were made after a delay of seven months beginning in December 1956. At the start-up, there were numerous difficulties with the equipment of the plant, having nothing to do with the ca-

---

7. Any more than D&Z could be charged with failure to incorporate in the revision the necessary equipment to provide for the use of additives, an improvement in the process adopted at a later date.

8. In September down-comer ducts were adjusted. In October a cooling zone was added by erecting a longitudinal wall between the incoming and outgoing sections of the oven and turning off the heat in the outgoing section. In December a circulating fan and an additional duct were added to the carbonator.

pacity of the oven and for which D&Z was in no way responsible. In its pretrial statement BICOA said, "Virtually every other piece of equipment in the plant malfunctioned at the time of the attempted start-up. * * * It would unduly lengthen this memorandum to list each piece of equipment which did not function as it should have." Besides this, the start-up of any new automatic plant, even one operating upon a well known and tried process, is, as a matter of common knowledge, bound to be attended with delays of various kinds, arising from minor defects colloquially referred to as "bugs".

Most of the difficulties and deficiencies referred to above were cleared up by the end of March. Before that date, even if the oven had had from the beginning sufficient heat and air capacity, the plant could not have attained anything like full continuous production.

From December 1956 on, the oven was intensively studied, tests were made, recommendations were prepared and negotiations carried on with the oven manufacturer looking toward the correction of the difficulty, and the delay from March through June is mainly attributable to the fact that the additional equipment for the oven which had to be obtained for the revision program was not available until the middle of June.

█ I believe that three months would be about the time needed for the ironing out of the other-than-oven difficulties in starting up BICOA's plant. It is true that the adjustments and correction of the equipment other than heat and air capacity actually took at least four months, but I believe that, had the oven been adequate at all times, that work would have taken no more than three. As long as it was obvious to everyone that, no matter how expeditiously the work on the equipment outside the oven-carbonator was done, the plant could not get into full continuous production until the oven was completely revised, it is more than likely that efforts would be concentrated upon the oven rather than corrections in equipment which, no mat-

ter how vigorously pushed, could not bring immediate results. From all the evidence, I am satisfied that, had the deficiencies of heat and air in the oven not existed and had the other defects been the only things holding up the plant from full production, they could and would have been corrected within a period of three months. I, therefore, hold D&Z liable for a four months delay, due to its initial breach of contract, in getting the plant into full production.

As to the final question, fixing the amount of money damages to award for the delay of four months is no easy task. The delay in bringing the oven into continuous production in turn delayed the further development of the plant and, in consequence, the time at which BICOA was able to begin to produce at the capacity at which it now does. Its loss was the equivalent of four months of normal production in a normal market.

An examination of the earnings history of BICOA, so far as it has been put into evidence, leads me to the conclusion that the profits which it lost by reason of the delay in attaining normal commercial production would be $100,000.

### (3)

The third part of BICOA's claim for damages is for alleged loss of carbon dioxide through cracks which developed at some unascertained time in the floor of the carbonator—a defect which has been found to be the fault of D&Z. However, the cracks were plainly visible and BICOA must have known that they existed from the time that they appeared. Nevertheless, BICOA continued to use the carbonator until April 1959 without correcting the condition, although several futile efforts may have been made to correct it by caulking. Incidentally, there is no satisfactory testimony as to the number of the cracks, their length, or when they appeared. The only fact in evidence about them is their width, $\frac{1}{8}''$ to $\frac{3}{8}''$.

█ Of course, a party who has suffered damage by reason of another's breach of contract may not sit back and allow the damages to mount when he

could reasonably have prevented the increase. It is true that the burden of showing that the damages could have been mitigated is upon the wrongdoer, but this burden does not relieve the injured party from his primary burden of proving the extent of his damage—an entirely different matter.

In the present case, BICOA asserts that it lost six tons, or 120,000 cubic feet, of carbon dioxide each day that the plant was in operation. This assertion is sharply contested by D&Z which produced expert opinion that no such amount could possibly have been lost through the cracks in the floor.

■ Upon the issue of fact thus raised, I find that the volume of gas claimed by BICOA or anything like it did not escape through the floor. I simply do not believe it possible that it could have. This finding leaves the record before me with no basis upon which I can find the amount of gas that may have escaped through these cracks of unspecified number, unspecified length and existing for an unspecified time. Any sum which I might award as damages would be the purest kind of guess.

Another reason for rejecting this part of the claim is that, if the cracks were of sufficient extent and existed for a long enough time to have allowed the escape of the amount of carbon dioxide that BICOA claims, then BICOA could not recover for such part of the loss as it could have avoided, provided the necessary steps would not have involved undue expenditure or risk.[9]

There is no evidence as to what the cost of making the necessary repairs would be, but it was proved that cracks in the oven floor were repaired for about $100. Although, as stated, the burden was on D&Z to show that damages could have been mitigated without unreasonable expense, a judge is not required to divorce himself from his common sense, and I am forced to the conclusion that repairs could have been made and the condition corrected for a mere fraction of the sum claimed for the loss. By way of illustration, if a plumber, called in to install a kitchen sink, leaves a faucet which drips, the housewife may not permit the faucet to go on dripping for an indefinite time and then charge the plumber with her excess water bills. I disallow the whole claim for loss of carbon dioxide for want of proof by sufficient satisfactory and credible evidence to establish it with the reasonable certainty required by the law. Restatement, Contracts, Section 331(1).

### Interest

D&Z claims interest on the $184,413.01 awarded to it. Under the contract, payment was due 15 days after D&Z submitted its monthly bills.

■ The general rule is that on a liquidated claim (and D&Z's claim was liquidated from its various due dates) interest is due as a matter of right. I am aware that in some cases in which a counterclaim has been asserted it has been held that interest should be allowed only for the sum remaining due after the amount of the counterclaim (unliquidated when made but subsequently liquidated) has been subtracted. Even in such case the matter is discretionary with the Court. Restatement, Contracts, Section 337, noting particularly Illustration 10. The facts of the present case do not in my judgment justify a reduction or disallowance of the claim for interest by reason of the counterclaim.

■ As has been pointed out, in February 1957 BICOA, with full knowledge of the oven deficiency and its potential counterclaim therefor, agreed, unequivocally, (in connection with a request by it that D&Z continue on the job) to "continue to make payments under this contract." This, it seems to me, eliminates any doubt as to liability to pay interest on such parts of the claim for which BICOA was billed in the usual course of dealings between the parties. D&Z justifiably left the job because of BICOA's continuing breach of this agreement (see

9. Restatement, Contracts, Section 336(1).

Guerini Stone Co. v. P. J. Carlin Constr. Co., 248 U.S. 334, 39 S.Ct. 102, 63 L.Ed. 275) and interest will be allowed upon the invoices for which BICOA was so billed. This includes the invoices of August 10, 1957.

It does not include invoices of October 11, 1957, and March 13, 1958 amounting to $66,389.72. These invoices were not submitted to BICOA as they accrued and demand for payment of them was made in a mechanics lien action brought by D&Z against BICOA. Under these circumstances, I do not feel that in the exercise of my discretion I should allow interest on them. They are not covered by the letter of February 27 referred to above.

Interest will not be allowed upon the counterclaim.

An order for judgment in accordance with the foregoing may be submitted.