**NEVILLE CHEMICAL COMPANY,**
Plaintiff,

v.

**UNION CARBIDE CORPORATION,**
Defendant.

Civ. A. No. 65–782.

United States District Court
W. D. Pennsylvania.

Dec. 31, 1968.

Reed, Smith, Shaw & McClay, Weis & Weis, Pittsburgh, Pa., for plaintiff.

Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendant.

## OPINION

WEBER, District Judge.

This case arises from the extreme complexities of the modern hydrocarbon chemical industry. The products involved are derived originally from natural gas production. The gas is reduced to a liquid state, then formed into solids, which then become the basic materials for the manufacture of a wide variety of consumer products. The chain in this case begins with the defendant, Union Carbide, processing the natural gas, reducing it to liquid form, refining it, selling one of the products (we conclude that there are no such things as "by-products" in modern chemical industry) to the plaintiff, Neville Chemical Company. Neville's business is the production of resins for use by the manufacturers of floor tile, shoe soling, rubber matting, adhesives, inks, paints and chewing gum. Some of these in turn sell their products to other manufacturers who produce consumer products, such as shoes, or to the building trades for the installation of floor tiling in buildings.

Neville Chemical Company had been purchasing a product known as "resin former oil" from Union Carbide for several years. For about two years before the cause of action in this case arose it had been purchasing a grade or type of that oil which had been given the designation of U–171. This product was developed by Union Carbide in an attempt to meet Neville's particular requirements as to color, viscosity, solubility, and polymerizable content, or the degree to which the oil would "jell" or set into a solid, all for the purpose of manufacturing resins by Neville for its industrial customers in the fields mentioned.

Union Carbide shipped the product to Neville from its facility in the Kanahwa Valley near Charleston, W. Va. It had been collected there from four producing points, one of which was Union Carbide's Seadrift, Texas, plant. The evidence showed that a highly reactive contaminant had been introduced into the production line of this oil at the Seadrift plant. This contaminant had entered into a chemical combination with the natural components of the oil at Seadrift. The Seadrift oil had been transported in barges to the collecting point; and then after mixing with oils from other production points, and further refinement or selection, had been shipped to Neville's plant at Pittsburgh, Pa., by barge and by tank car to Ne-

ville's plant at Anaheim, California. At both these plants the resins were made and shipped to various customers in this country and abroad for manufacture into floor tiles, shoe soles, paper coatings, and the like. After these end products had been manufactured and passed into the hands of the consumers, the chemical compound which had been formed by the introduction of the contaminant began its reverse process, breaking down into components, one of which was an acid which emitted a persistent foul odor whose description taxed the powers of witnesses to explain, but which required the removal or destruction of the finished products.

Neville brought this suit against Union Carbide based upon allegations of negligence and breach of warranty, and claimed damages for its own business losses and expenses as well as indemnity for damage claims which it had settled with its own customers.

The trial before the jury was conducted in two stages. All evidence as to liability was submitted to the jury on special interrogatories, and after their findings of liability the issues of damages were tried and the jury returned a verdict for the plaintiff on the various categories of damages submitted, in the total amount of $2,151,534.

We now face post-trial motions of the defendant for judgment notwithstanding the verdict, alterations and amendment of judgment, and new trial.

This case was well and ably prepared and tried by counsel on both sides. The jury trial extended over a seven week period and presented technical scientific evidence of a complex nature on the questions of liability, and voluminous accounting testimony on damages. The Court appreciates the skill and industry of counsel in presenting these complex matters in orderly and logical form to the court and jury, and even more the unfailing courtesy which all counsel extended to each other and the court throughout the long and strenuously contested proceedings.

Nevertheless, a verdict was rendered in a very large amount, and we are faced with reviewing the trial on the defendant's post-trial motions. Because of the size of the verdict and the strenuously contested issues, we are very conscious that our decision on the post-trial motions may not end the lawsuit. Legal issues as to both liability and damages are complex and the strenuous contest over these issues may be expected to lead to the Court of Appeals despite whatever determination we may make of them here.

We do not speak of this prospect of appeal as an excuse for our failure to give adequate consideration to all grounds advanced in the post-trial motions. They are numerous. We have considered them all, but we are giving principal attention in this opinion to those which we believe to be most critical and most strongly advanced.

■ The jury having found for the plaintiff we must take all the evidence and all the inferences reasonably arising therefrom in the light most favorable to the plaintiff.

The defendant's arguments are principally directed to the following topics:

I. Proof that any action of the defendant was the proximate cause of plaintiff's damages was insufficient.

II. The disclaimer provisions of the sales agreement limit the plaintiff's claim in time and amount, and bar recovery for breach of warranty or negligence.

III. Damages awarded plaintiff for settlement of its customer claims are contrary to the law and the evidence in this case.

IV. Damages awarded plaintiff for its business losses are contrary to the law and the evidence in this case.

We will consider each of these topics under the applicable sections of this opinion.

## I. PROXIMATE CAUSE AND NEGLIGENCE

At the outset we must consider defendant's contentions that no sufficient evidence was produced to support a finding that a causal relation existed between defendant's resin former oil U–171 and the damages claimed, both directly by Neville, and by Neville on account of settlement of customers' claims.

We believe this causal relationship was fully supported by both circumstantial and scientific evidence. Various customers of Neville in different product lines such as floor tile, shoe soles and heels, rubber matting, paints and paper coatings, all experienced odor problems beginning at about the same time. By a process of elimination, each made an independent determination that particular Neville resins were the source of their problem, and the problem disappeared when they ceased using the particular Neville resin. By a similar process of investigation Neville determined that the odor was traceable to shipments of defendant's U–171 received after a certain date. Neville had the same problems at two separate processing plants, using different processing methods, but a common ingredient, defendant's U–171. Other Neville resins which did not contain U–171 were free of odor. When Neville ceased using U–171 the odor complaints vanished.

The scientific research conducted thereafter confirmed these conclusions, and traced the offending material to defendant's Seadrift, Texas plant. At different times material from four separate plants of defendant were combined to produce the U–171 delivered to Neville, but it was only those shipments which contained the Seadrift plant production which were found offensive. Later investigation revealed that the dripolene at the Seadrift plant had come in contact with ethyl acrylate, a substance not naturally present in the hydrocarbons from which the dripolene is produced. The evidence showed that the ethyl acrylate contact at Seadrift began at a certain date, when a change in the production process was introduced, and that all subsequent reactions are identified in proper time sequence with that date.

The scientific testimony showed that ethyl acrylate is a known highly reactive chemical, that its combination with the hydrocarbons in the ethylene process produces a known and expectable chemical reaction which should be recognized by trained chemists. This reaction produces a norbornene ester, whose presence in the dripolene and the resultant resin former oil U–171 is not readily detectable unless the possibility of its presence is known. The norbornene ester is not a stable compound and the process of its formation is reversible. In its decomposition its acid factor is liberated, and this is the source of the obnoxious odor. Thus the Seadrift dripolene came into contact with the ethyl acrylate, the norbornene ester was formed, the dripolene was shipped to defendant's Charleston, West Virginia plant and mixed with dripolene from other production sources, cuts were drawn off from this mixture to meet plaintiff's requirements as to color and viscosity and shipped to plaintiff's plants at Neville Island, Pennsylvania, and Anaheim, California. There the oil was incorporated into resins which were sold to plaintiff's customers, who in turn incorporated the resins into floor title, shoe soles, paints and paper coatings. Only when these products were ready for the ultimate consumer did the reaction from the norbornene ester begin and the obnoxious odor appear.

We believe that the ring of circumstantial evidence was strong, and was reinforced by the scientific testimony. The most striking evidence to support this conclusion came from one of defendant's own witnesses, that defendant knowingly changed its production process by the re-introduction of dripolene which had been exposed to ethyl acrylate into its dripolene stream re-run. It was aware of possible adverse reaction and defendant's own employees were alerted to watch for and report any such reaction. This evidence shows that defend-

ant undertook a known and calculated risk in the hope of increasing the yield at its Seadrift plant.

Defendant's evidence to rebut this chain of circumstantial and scientific evidence as to causal relationship was not sufficient to overcome plaintiff's proofs in the minds of the jury. Plaintiff's evidence supports the jury's finding both as to the causal relationship and as to the reasonableness of plaintiff's actions in settling the claims of its customers.

As to evidence in support of the finding of negligence much of which we have discussed above applies. The jury found defendant negligent both in the processing of the dripolene by allowing it to come in contact with the highly reactive ethyl acrylate, and in the failure to warn plaintiff of its change in processing methods whereby an expectable chemical reaction might later develop. Defendant did warn its own employees who were subsequent in the production process to be on the alert, but it did not warn plaintiff.

It was shown that the presence of the norbornene ester was not expectable nor was it readily detectable in the product delivered to plaintiff until the reverse reaction set in. Even then, it required long and extensive research on the part of plaintiff to isolate and identify the offending component, without the prior knowledge of the presence of ethyl acrylate in the original processing.

■ Defendant argues that plaintiff presented no evidence of the standard of care used in the trade by which defendant's conduct could be measured. We do not believe that any such evidence was essential to plaintiff's case. Such evidence might be relevant to the question of negligence, but it is not controlling as to whether, by conforming to it, the defendant has exercised the care of a reasonable man, or by departing from it has failed to exercise such care. "Customs which are entirely reasonable under the ordinary circumstances which give rise to them may become quite unreasonable in the light of a single fact in the particular case." See Restatement, Torts 2nd, § 295A, Comment C.; Maize v. Atlantic Refining Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449 [1945].

■ We conclude that the plaintiff's evidence was wholly sufficient to support the conclusions that defendant's use of ethyl acrylate in the processing of dripolene and its failure to warn plaintiff of the possible reaction from this use was the proximate cause of the damages suffered by plaintiff and the customers of plaintiff for which plaintiff made settlement. We also conclude that such use of ethyl acrylate was negligent in that it created an unreasonable risk of harm to plaintiff and the users of plaintiff's products, and that such unreasonable risk of harm was also created by the failure of defendant to warn plaintiff of the presence of the unknown and unsuspected reactive ingredient, the consequences of which were not only foreseeable, but actually anticipated by defendant.

## II. THE EFFECT OF THE DISCLAIMERS

Defendant relies upon the disclaimers and the time and damages limitations printed in its sales agreement form, as relieving it from any warranty obligation.

The time limitation provides that buyer unqualifiedly accepts all material and waives all claims in respect thereto unless he gives notice of a claim within fifteen days of delivery. The damage limitation limits claims to the purchase price of the material.

The disclaimer states: "Buyer assumes all risk and liability for the results obtained by the use of the material delivered hereunder in manufacturing process of Buyer or in combination with other substances."

It was further provided: "This agreement contains all of the representations and agreements between the parties hereto and no warranties shall be implied. * * *"

We have little hesitation in deciding that the application of the time limitation is manifestly unreasonable. The defect in the material was not only latent but was not discoverable by ordinary inspection and testing. The evidence clearly showed that there was no reason to suspect the presence of the chemical contaminant until the complex chemical process began its reverse reaction. After the reverse reaction began it was relatively simple to identify the contaminated Neville resin as the source of the odor in the various end products, and likewise to identify defendant's U–171 as the source of the odor in Neville resins, but it was only by long and extensive chemical research that the identity of the contaminant was discovered by Neville. All the time Union Carbide had a memorandum in its files which had been circulated to a number of its personnel concerned with the production of this product advising of the contact with the contaminant and requesting reports of any adverse reaction.

██ Under these circumstances we hold the fifteen day time limitation "manifestly unreasonable" and invalid under the Uniform Commercial Code, 12A P.S. § 1–204. A time limitation which renders warranties ineffective as to latent defects not discoverable within the time limitation is manifestly unreasonable. Like tulip bulbs shipped in the fall which did not bloom in the spring, a time limitation of a few days after receipt of shipment renders any warranties ineffective as to defects not discoverable on ordinary inspection. Vandenberg & Sons N. V. v. Siter, 204 Pa. Super. 392, 204 A.2d 494 [1964].

██ We come to a similar conclusion with respect to the limitation of damages to the return of purchase price. Such a remedy would be wholly inadequate in the case of a latent defect not discoverable within a reasonable period after receipt of shipment. Like the fifteen day limitation, it is obviously designed to cover a situation where the defect is discoverable upon receipt of shipment, reasonable inspection and prompt discovery of defects. The parties can be restored by prompt notification to the seller, return of the purchase price, and return of the material. But when the defect is not ordinarily discoverable until the material has been processed, furnished to manufacturers, processed into materials, then manufactured into consumer goods, passed through the wholesale and retail trade into the hands of consumers, then such a remedy is far below a bare minimum in quantum, and is ineffective under the Uniform Commercial Code, § 2–719(2).

Such limitations on time and damages, when the defect is latent, are illusory and under the circumstances of this case represent no remedy at all. They are comparable to the limitation in the former standard automobile warranty which limits the remedy to replacement of the defective part, which was nullified in the landmark case of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 [1960].

██ The plaintiff contended and the jury found that defendant had breached certain express and implied warranties in connection with the sale of the U–171 resin former oil.

The first contention, supported by the jury's finding is that there was an express warranty given by Union Carbide by furnishing a sample of the U–171 in February 1961, and a trial barge shipment in October 1961, and subsequently shipments of uncontaminated U–171.

The Pa. Uniform Commercial Code, § 2–313 provides:

"(1) Express warranties by the seller are created as follows:

\* \* \* \* \* \*

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model."

There is no disclaimer of this express warranty in the printed contract in this case. The disclaimer of Par. (9) refers to implied warranties only.

The sales agreement here does not conform to the requirement of the Uniform Commercial Code § 2–316(2) that any disclaimer of an implied warranty of merchantability must be made expressly, specifically reciting the word "merchantability". This was not done here; it merely states that there are no implied warranties.

The jury also found that Union Carbide knew or had reason to know of Neville's particular purpose in purchasing U–171, and that Neville relied upon Carbide to furnish material suitable for this purpose and thus an implied warranty of fitness for the purpose existed which was breached by Union Carbide.

In connection with this warranty, we believe that the disclaimer is insufficient to relieve Union Carbide of this warranty. The written contract in this case was executed about two years after the parties began their dealing in this product, a course of dealing had been established. The evidence showed many attempts to supply a product suited to Neville's needs. The typewritten portion of the sales agreement reduced to writing certain terms of price, quantities, delivery and certain limitations on physical properties. The printed portion of the contract contains the alleged limitations on the reverse side, in uniform size print, no more conspicuous than the other provisions. § 2–316(2) of the Uniform Commercial Code requires a disclaimer of a warranty of fitness to be "conspicuous". This imparts something that stands out from, in a fashion to draw attention to it, the other printing on the form.

In any event, warranties under the Uniform Commercial Code § 2–317 are cumulative, unless such a construction is unreasonable. We find nothing inconsistent or unreasonable in implied warranties of merchantability and fitness and express warranties of sale by sample construed together.

We do not find that the provisions of "Appendix A" of the sales agreement between the parties, entitled "Specifications—Resin Intermediate U–171" meet the definition of "Exact or Technical Specifications" as used in § 2–317(a) or the situation of Comment 9 to § 2–316 which applies to "The situation in which the buyer gives precise and complete specifications to the seller * * *.". The specifications set forth in Appendix A refer only to the "Limits" of four qualities of the resin intermediate—color, solubility, aniline point, and polymerizable content. This is in no sense "exact specifications" or "precise and complete specifications" which would displace an inconsistent sample, or an inconsistent implied warranty of merchantability.

Plaintiff's claim was based upon allegations of negligence as well as breach of warranty, and the jury's verdict supports this claim.

The disclaimer set forth in Par. 7 of the agreement does not specifically disclaim liability for negligence. Such disclaimers are closely scrutinized by the courts when asserted as exculpating from liability for negligence. Dilks v. Flohr Chevrolet, 411 Pa. 425, 192 A.2d 682 [1963]. They are construed strictly against any party seeking their protection. Crew v. Bradstreet, 134 Pa. 161, 19 A. 500, 7 L.R.A. 661. They must spell out the intention of the parties with the greatest particularity. Morton v. Ambridge Borough, 375 Pa. 630, 101 A.2d 661 [1954].

In Morton v. Ambridge Borough, supra, the Court noted that nowhere in the disclaimer clause did the word "negligence" or any of its cognates appear. Thus it was held that while the disclaimer would apply to damages for trespass on land, it did not impair the normal right to recover for damages suffered as a result of negligence.

This strict limitation on disclaimers of liability for damages for negligence is a social development of recent years and is strongly emphasized in many recent decisions of the Supreme Court of Pennsylvania. Dilks v. Flohr Chevrolet, supra [1963]; Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc., 404 Pa.

53, 171 A.2d 185 [1961]; Employers Liability Assurance Corp. v. Greenville Businessmen's Assoc., 423 Pa. 288, 224 A.2d 620 [1966] and Galligan v. Arovitch, 421 Pa. 301, 219 A.2d 463 [1966]. Because of this strongly reiterated statement of public policy, we do not consider cases of earlier vintage on the effect of such disclaimers to be of valid current authority. Cf. Shafer v. Reo Motors, 205 F.2d 685 [3rd Cir., 1953] and Charles Lachman Co. v. Hercules Powder Co., 79 F.Supp. 206 [E.D.Pa., 1948].

### III. DAMAGES FOR SETTLEMENT OF CUSTOMER CLAIMS

Defendant attacks the adequacy of plaintiff's proof of liability to its own customers, the reasonableness of such settlements and the charge of the court thereon. Defendant argues that since the jury found plaintiff not guilty of negligence, it should follow that its own liability to its customers would be under its warranties to its customers. It is noted that plaintiff sold to its customers under a printed warranty, with disclaimers, similar to that contained in the sales agreement between plaintiff and defendant.

█ Defendant argues that there is no evidence that plaintiff was held legally liable to its customers, and that at best it settled customer claims on advice of counsel. This alone would not be enough. Martinique Shoes Inc. v. New York Progressive Wood Heel Co., 207 Pa.Super. 404, 217 A.2d 781 [1966]. The above case cites the Pennsylvania rule as that cited in 42 C.J.S. Indemnity § 25.

"Thus, while a person who is liable for injuries caused by the negligence or wrongful act of another may adjust and pay the claim therefor and need not await the result of a suit in order to be entitled to indemnity from the wrongdoer, the amount claimed must be reasonable and just, and the payment must have been made in good faith, after notice to the indemnitor; and a person so paying assumes the

risk, in an action against the wrongdoer for indemnity, of being able to prove the actionable facts on which his liability depends as well as the reasonableness of the amount which he pays".

While the Martinique case denied indemnity to the plaintiff, the opinion in that case reveals that an essential element of plaintiff's liability to its customer was not proven.

"However, how Mrs. Witt's accident happened was not proved." [p. 407, 217 A.2d p. 782].

Plaintiff's case here was well supported by evidence of how the damages suffered by its customers occurred. Much of the same evidence introduced to support plaintiff's direct claim for damages [as opposed to its indemnity claim] also serves to support the claims of liability made against plaintiff by its customers. The scientific evidence of the nature of the chemical defect in the U–171 also shows that this defect persisted in the resins which plaintiff sold to its customers.

To the extent that a plaintiff claiming indemnity must offer the same evidence against indemnitor in the second action as was relied upon to establish the case against plaintiff, we believe that the record in this case satisfies that requirement.

Plaintiff presented the customers who had made claims. Each told how the problem arose and how it was traced to plaintiff's resin. The chain of causal relationship in their claims was a well-established one as was plaintiff's in its direct claim against defendant. Each of these customers testified as to the extent of its business with plaintiff, its reliance upon plaintiff to provide a resin fit for its purposes, plaintiff's knowledge of their purposes, the unfitness of the resin for their purposes because of the odor which it developed, and the claims which they themselves faced and settled because of the odor and the products which they were forced to destroy, abandon or otherwise dispose of because

of the unacceptable nature of the product.

That plaintiff faced claims on which it was legally liable to its customers was well and abundantly supported by evidence of the same kind and character as that which supported plaintiff's direct claim against defendant.

It is noteworthy also that many of the customers whose claims were made against plaintiff had themselves faced and settled claims of their own customers. The chain reaction of events here proceeded as far as the fifth degree. A customer who found a pair of shoes unfit claimed against the retail shoe store, the retail shoe store in turn claimed against the shoe manufacturer (or perhaps against a wholesale distributor), the shoe manufacturer claimed against the manufacturers of the soles or heels, and the manufacturer of the soles or heels claimed against the plaintiff, Neville, which supplied the defective resin.

The reasonableness of such settlements made by plaintiff to its customers was supported by evidence of the cost of the defective resin sold, the price of defective products in their own and their sub-customers' inventories, costs incurred in handling and disposing of defective materials, and related expenses. Evidence of these were produced in great detail.

The evidence also showed that plaintiff investigated claims, that it used the services of professional claim adjusters, that it had its local counsel review these claims, and hired counsel in other parts of the country to appear and defend suits which were brought by some of its customers, or to negotiate claims with other customers who had threatened suit. The jury was not told that the professional claim adjusters were employed by plaintiff's liability insurance carrier, whose joinder as party-plaintiff defendant sought to secure, but the jury was informed that professional claim adjusters were handling many of the claims.

We believe that all of this evidence, if submitted to a jury, would be sufficient to support a finding against Neville as to both its liability and the amount thereof in actions brought by its customers.

It appears to the court that defendant's argument, strictly applied, would require an indemnitee in every case to submit to trial and judgment every claim against him before he would be able to assert his right to indemnity. However, the law does not require him to go to that extreme.

"And even though the original buyer has not yet been held liable to the subvendee, the amount of his probable liability may be recovered from the original seller." Wolstenholme, Inc. v. Jos. Randall & Bro. Inc. 295 Pa. 131, 144 A. 909 [1929].

One additional element should be considered here. There was evidence that the defendant Union Carbide was given notice of these claims and opportunity to investigate and defend. Union Carbide did nothing.

It has been held that the entry of judgment against an indemnitee in a contested proceeding where there has been notice to the claimed indemnitor and opportunity to defend, is conclusive against the indemnitor as to all questions determined therein which are material to a recovery against him in an action for indemnity brought by the indemnitee.

The nature or the quantum of proof required of an indemnitee claiming against an indemnitor is:

"Where the indemnitor is notified of the pendency of an action against the indemnitee in reference to the subject matter of the indemnity and is given an opportunity to defend such action, the judgment in such action, if obtained without fraud and collusion, is conclusive on the indemnitor as to all questions determined therein which are material to a recovery against him in an action for indemnity brought by the indemnitee * * *." 42 C.J.S. Indemnity § 32, p. 614 citing the following Pennsylvania cases in support.

Renschler v. Pizano, 329 Pa. 249, 198 A. 33 [1938]; City of Philadelphia v. Reading Co., 295 Pa. 183, 145 A. 65 [1929].

It appears from the cases that a judgment against an indemnitee in a contested action where there has been notice and opportunity to defend, is conclusive, except for fraud or collusion; but where such notice is absent "the judgment is not conclusive and the indemnitor may interpose his defenses. * * *" Renschler v. Pizano, supra.

A variation of the above situation appears in Wise Shoes, Inc. v. Blatt, 107 Pa.Super. 473, 164 A. 89 [1933], where suit was brought, notice and opportunity to defend was given and where indemnitor was actually present at trial; but where at the conclusion of trial the indemnitee's counsel consented to a directed verdict against his client:

"The fact of voluntary payment does not negative the right to indemnity. It merely varies the degree of proof needed to establish the liability of the indemnitor. Dunn v. Uvalde Asphalt Co. 175 N.Y. 214, 67 N.E. 439; Thompson on Negligence, p. 789: In such a case the rule is that, while the judgment is not conclusive as to the issues therein decided, it is presumptive evidence of those facts and stands unless contradicted by the indemnitor. * * *" 164 A. at p. 91.

Thus, where there has been a voluntary settlement, as in the present case, even with notice, "there rests upon the indemnitee the burden of justifying his payment of damages by offering against the indemnitor in the second action practically the same evidence as was relied upon to establish the case against the indemnitee in the first action." *Martinique Shoes, Inc.* supra.

■ The plaintiff here, Neville, has produced the evidence on which the claims against it was based. It has shown what the bases of its liability were. It has shown the amounts of the payments made and the bases for such payments, and it has shown notice and opportunity to defend.

In such a situation this evidence is presumptive evidence of liability and reasonableness and places the burden of going forward with the evidence upon the indemnitor.

The jury was charged that the plaintiff Neville must prove its claim by a preponderance of the evidence, that this burden of proof must be met on the question of proximate cause, as to each and every element of damages, that Neville must prove any settlements were reasonable and bona fide.

The jury was further charged that if the jury was presented with evidence of all these factors, and that if Neville had shown that it made settlements pursuant to appropriate negotiation, investigation, consultation with counsel, and in accordance with the standard of a reasonable businessman, and had given defendant notice and opportunity to defend these claims, then the burden of proof on the question of reasonableness shifted to defendant to show that they were unreasonable.

■ We believe that the charge, taken as a whole, expresses the correct view of the law. The burden of proof never shifts in the sense that plaintiff must prove every element necessary to recovery by a preponderance of the evidence. But where a plaintiff has produced some evidence, sufficient to establish the necessary elements prima facie, that evidence, if uncontradicted, unrebutted, and if believed by the jury, is sufficient to satisfy his burden. The defendant may not sit idly by. He has the obligation of countering the evidence against it. In this sense the burden shifts. In the classic text-book sense, this burden is called the burden of going forward with the evidence. We believe that the obligation of the trial judge is best explained in Arco Metalscraft Co. v. Shaw, 364 Pa. 39, 70 A.2d 850 [1950]:

"A trial judge should also explain as to the possible shifting of the burden of proof during the trial. This Court said in Henes v. McGovern, 317 Pa. 302, 310, 176 A. 503, 504, quoting

Lord Justice Bowen, ' "If he [plaintiff] makes a prima facie case, and nothing is done by the other side to answer it" ' the plaintiff wins. ' "* * there are points at which the onus of proof shifts, * * * it is not a burden which rests forever on the person on whom it is first cast, but as soon as he, in his turn, finds evidence which, prima facie, rebuts the evidence against which he is contending, the burden shifts until again there is evidence which satisfies the demand. Now, that being so, the question as to the onus of proof is only a rule for deciding on whom the obligation rests of going further if he wishes to win." ' "

## IV. DAMAGES FOR LOSS OF PROFITS

Defendant objected to the submission of plaintiff's claims for loss of profits to the jury. The objection is that such damages are speculative, remote and not provable with sufficient precision. Defendant cites Rubin & Sons, Inc. v. Consolidated Pipe Co. of America, 396 Pa. 506, 153 A.2d 472 [1959], and Michelin Tire Co. v. Schulz, 295 Pa. 140, 145 A. 67 [1929].

*Rubin*, the most recent of these cases, dealt with a claim for consequential damages for breach of warranty and nondelivery under the Pennsylvania Uniform Commercial Code [12A P.S. § 2–715]. The item claimed in the complaint was for "good will of customers". We do not know the specific evidence that would have been offered and excluded because the case on appeal came before the Appellate Court on a ruling sustaining certain preliminary objections to a complaint in assumpsit. The Court held:

"There is no indication that the Uniform Commercial Code was intended to enlarge the scope of a buyer's damages to include a loss of good will. In the absence of a specific declaration in this respect, we believe that damages of this nature would be entirely too speculative, and that the court be-

low acted properly in sustaining Consolidated-Lustro's objections thereto."

The Court relied on Michelin Tire Company v. Schulz, 295 Pa. 140, 145 A. 67 [1929], where a claim for loss of good will was denied, with this explanation:

"So far as appears, the tires in question were all used by defendant's customers and paid for, so he lost nothing hereon. What he claims is that, because the tires were less durable than recommended, he lost customers, which otherwise he would have retained and whose business would have netted him a profit * * * This is entirely too speculative and not the proper measure of damages." [p. 144, 145 A. p. 68].

We find a very substantial body of opinion in the commentaries that loss of profits are recoverable upon proper proof both in contract and tort.

At the outset we must distinguish between those cases where the decision turns on proof of the fact of the damage as a proximate result of defendant's action, and those involving uncertainty as to the amount of damage. This distinction is underlined in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 [1931], where the Court noted: "It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage." [562, 51 S. Ct. 250].

We do not feel that we need comment at any length on the testimony as to the fact of damages here. A substantial number of plaintiff's customers and former customers testified as to their requirements for resins in the manufacture of floor tile, paints, paper coatings, shoe soles and heels, and rubber matting. They testified to their prior satisfaction with plaintiff's products. They clearly established that they abruptly ceased buying from plaintiff upon the discovery of the defective nature of the product, some permanently and some for a temporary period. They were forced

immediately to find another source of supply. It was established beyond question that very substantial losses in sales were the immediate and direct result of the appearance of the malodorous element in the plaintiff's resins.

We then come to the second element, the extent of these damages. This problem is illustrated by the two trials and appeals in the Tom Mix Case; Western Show Co. v. Mix, 308 Pa. 215, 162 A. 667 [1932]; affd. after remand 315 Pa. 139, 173 A. 183 [1934]. After the first trial, and perhaps influenced to some extent by the size of the verdict, the trial court granted a new trial on the grounds of the speculative nature of the evidence on the amount of damages. This grant of a new trial was sustained by the Pennsylvania Supreme Court on the first appeal. After the second trial, and the introduction of new evidence in support of damages, a second verdict for plaintiff was sustained on appeal. That the court was concerned with the amount of damages and the necessary proof thereof is clear when it mentioned the prior case in considering the second appeal.

> "That plaintiff is entitled to recover damages from defendant for the breach of his contract cannot be doubted, and that they were substantial and not merely nominal is also beyond cavil, but the difficulty then was, and now is, how to find 'a reasonably safe basis' for calculating them." [p. 141, 173 A. p. 184].

The Court allowed the verdict to stand on the basis of expert testimony estimating the diminution of gate receipts after Tom Mix failed to perform with the 101 Ranch Wild West Show.

Plaintiff's evidence as to the amount of loss of sales showed a prior consistent history of growth and continued sales of its resin products, a continuing need in the industry for these products, government records relied upon by the industry as indicators of production and demands for the products and the specific losses in sales volume directly following the sales of the defective resin. The evidence was voluminous, detailed, specific and direct, relying not only on extensive documentation and supporting financial data, but on testimony both of witnesses with personal knowledge, but also expert opinion testimony.

■■■ The general rule of law applicable to claims for loss of profits in both contract and tort actions allows such damages where (1) there is evidence to establish them with reasonable certainty, (2) there is evidence to show that they were a proximate consequence of the wrong; and, in contract actions, that they were within the contemplation of the parties. 22 Am.Jur.2d Damages 171. Taylor v. Kaufhold, 368 Pa. 538, 84 A.2d 347, 32 A.L.R.2d 575 [1951].

Damages of this sort have been allowed in a variety of Pennsylvania cases, both in tort; Kosco v. Hachmeister, Inc., 396 Pa. 288, 152 A.2d 673 [1959]; Ashcraft v. C. G. Hussey & Co., 359 Pa. 129, 58 A.2d 170 [1936]; and Watsontown Brick Co. v. Hercules Powder Co., 265 F.Supp. 268 [M.D.Pa.1967], affd. per curiam 387 F.2d 99 [3rd Cir. 1967], and in contract cases; Taylor v. Kaufhold, supra, Western Show Co. v. Mix, supra; Day & Zimmerman, Inc. v. Blocked Iron Corp., 200 F.Supp. 132 [E.D.Pa. 1961].

■■■ The "contemplation of the parties" element in the contract cases specifically included in the U.C.C. 2–714(2) and 2–715(2) has given the courts some trouble, see Keystone Diesel Engine Co. v. Irwin, 411 Pa. 222, 191 A.2d 376 [1963], but we do not believe it should be a material element here. In the first place the evidence showed clearly that defendant Union Carbide knew the extent and nature of plaintiff's business as a supplier of resins to various industries. It knew the particular purposes for which Neville required the resin former material. But, more importantly, the special interrogatories in this case established negligence on the part of Union Carbide for which the requirement of "contemplation of the parties" is not an element.

The jury having found liability both for breach of warranties and negligence, we do not believe that this element is of material significance in this case. The element of negligence shown by the evidence was particularly strong. We have little doubt that regardless of the warranty claims, plaintiff's verdict has strong support on the evidence of defendant's conduct.

Why should the distinction between damages allowable under breach of contract and those in tort have any effect in this case. The Pennsylvania Supreme Court has faced this question in *Kaufhold*, supra. There plaintiff brought his action in assumpsit for illegal retention of premises under a lease. The damages claimed were not for the rental value of the leasehold, but for the profits plaintiff claimed that he would have made if the defendant had not illegally retained possession of the premises. The court gave the answer to this seeming dilemma:

> "If plaintiff, tenant under a lease, had brought an action of trespass on the case, he could have recovered whatever direct damages he suffered for the injury to his use or enjoyment of the property."

But he had sued in assumpsit. The court found the distinction to be meaningless in view of the abolition of most distinctions between trespass and assumpsit under Pennsylvania procedural practice. "* * * therefore in this case the form of action should not prevent the recovery of damages to which the injured party is justly entitled and which he successfully proved." [368 Pa. p. 544, 84 A.2d 347, 351].

It is of course true that the element of loss of profits is always attended with some uncertainty. But mere uncertainty has been rejected by a long series of cases. "* * * while, in the nature of the case, the amount of profits was necessarily uncertain, the law does not require absolute certainty of data upon which they are to be estimated. All that is required is such reasonable certainty that damages may not be based wholly upon speculation and conjecture." Macan v. Scandinavia Belting Co., 264 Pa. 384, 107 A. 750, 5 A.L.R. 1502 [1919]. See also Gardner v. The Calvert, 253 F.2d 395 [3rd Cir., 1958], cert. den., Sound S.S. Lines, Inc. v. Gardner 356 U.S. 960, 78 S.Ct. 997, 2 L. Ed.2d 1067.

> "* * * while the damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate * * *" Story Parchment Co. cit. supra, 282 U.S. p. 563, 51 S.Ct. p. 250.

See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S. Ct. 400, 71 L.Ed. 684 [1927]; Palmer v. Conn. Ry. & Lighting Co., 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336 [1941]; Bigelow v. R. K. O. Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 [1946].

We, therefore, find that the evidence in support of loss of profits adequately established both the relationship between the defect in the product and the loss of profits, and the extent and duration of such loss.

## CONCLUSION

We cannot accept defendant's arguments that the special interrogatories as submitted were contrary to the Federal Rules of Civil Procedure or that the answers of the jury were inconsistent. Plaintiff advanced more than one ground of liability. These grounds are not mutually contradictory or inconsistent. Plaintiff established liability on more than one ground. Considering the trial as a whole we are of the opinion that the evidence strongly supported the allegations of liability and the damages which were undeniably extensive lead logically and proximately from the defendant's conduct.

## ORDER

And now, December 31, 1968, Defendant's Motion for New Trial is denied.

Defendant's Motion for Judgment Notwithstanding the Verdict is denied.

An Order Amending or Correcting the Verdict in accordance with the Stipulation of the parties will be entered upon the presentation of such Order by counsel.