NEVILLE CHEMICAL COMPANY

v.

UNION CARBIDE CORPORATION,
Appellant.

No. 17885.

United States Court of Appeals,
Third Circuit.

Argued Nov. 21, 1969.

Decided Feb. 6, 1970.

Rehearing Denied March 27, 1970.

John G. Buchanan, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., (George L. Cass, Pittsburgh, Pa., on the brief), for appellant.

Paul A. Manion, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., (John C. Bane, Jr., Charles C. Cohen, George M. Weis, Weis & Weis, Pittsburgh, Pa., on the brief), for appellee.

Before HASTIE, Chief Judge, and VAN DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This is an appeal from a judgment of the District Court for the Western District of Pennsylvania, entered after a jury found that Union Carbide Company (Carbide) had been negligent and breached its warranties in the sale of a certain unsaturated oil to Neville Chemical Company (Neville).

Carbide is a leading producer of various chemical products. One of these products is a hydrocarbon oil, used for forming resins, originally referred to as "unsaturated oil" and later called "U–171". Unsaturated oil is produced from dripolene, a product of Carbide's "cracking" operations, in which natural gas and other materials are processed into ethylene and additional commodities.

Neville is in the business of manufacturing hydrocarbon resins from products which it purchases from petrochemical companies such as Carbide. Neville produces resins at plants located at Neville Island near Pittsburgh, Pennsylvania, and Anaheim, California. It sells its resins to customers throughout the United States and parts of Canada for use in the manufacture of such items as floor tile, shoe soles, rubber matting, pigments for printing ink, paper packaging products, paint and varnish.

Over a period of fifteen years prior to the events in question, Carbide sold Neville large quantities of unsaturated oil. Carbide was aware of the particular purposes for which Neville purchased this product and knew the end uses of the resins which Neville manufactured.

By 1959, Neville was dissatisfied with the yield and color qualities of Carbide's unsaturated oil. In order to "get more money for their product" and because of Neville's dissatisfaction, Carbide instituted a program to improve the quality of its unsaturated oil. Beginning in January, 1960, it submitted to Neville several samples of refined unsaturated oil which it developed in an effort to meet Neville's requirements. None of these samples was satisfactory. In February, 1961, Carbide delivered to Neville a sample of refined unsaturated oil which Carbide called "UO–171". Neville then ordered on a trial basis and received in October, 1961, a barge shipment of approximately 300,000 gallons of this material, then designated "U–171" by Carbide. The trial shipment produced a satisfactory resin and Neville, in 1961 and 1962, purchased ten more 300,000 gallon barge lots of U–171. In February, 1963, Carbide also commenced shipment of U–171 to Neville's Anaheim plant.

After negotiations in Pittsburgh, Carbide drafted a year-to-year contract, dated February 12, 1963, to be effective October 1, 1962, by which Neville agreed to

purchase from Carbide its requirements of "Resin Intermediate, U–171", "estimated to be 1,500,000 gallons per year", at "17.5 cents per gallon". The agreement was signed by Neville in Pittsburgh and then transmitted to New York where it was signed by Carbide.

Although the contract does not define "Resin Intermediate, U–171", it specifies the required maximum or minimum limits on four of its physical properties, and states that "the material is a derivative of Dripolene a by-product from Ethylene production." The four properties itemized are "Polymerizable Content", "Resin Color", "Aniline Point", and "Resin Solubility". The contract contains Carbide's warranty "to deliver to Buyer material conforming to the specifications" and an "escape clause" in the event a "change in the character of Dripolene, for any reason whatsoever, render(s) it impossible * * * for [Carbide] to produce material conforming to the specification limits * * *". Paragraph 7, entitled "Claims", requires that notice of claims against Carbide be given "within fifteen (15) days after the receipt of such material"; provides that Neville "assumes all risk and liability for the results obtained by the use of any material * * * in manufacturing process * * * or in combination with other substances"; and provides that "No claim * * * shall be greater in amount than the purchase price of the material in respect of which such claim is made." Paragraph 9, states that the contract "contains all of the representations and agreements between the parties hereto and no warranties shall be implied."

All the U–171 sold to Neville was produced at and delivered from Carbide's Kanawha Valley facilities at Institute and South Charleston, West Virginia. Beginning January, 1963, dripolene from Carbide's Seadrift, Texas plant was imported into the Kanawha Valley by Carbide and, without Neville's knowledge, was used to produce U–171.

Without notice to Neville, but with notice to its own personnel,[1] Carbide in early June, 1963, changed its Seadrift, Texas ethylene process to permit ethyl acrylate, a chemical additive made from ethylene and used in the production of polyethylene, to be recycled into the ethylene stream, and thus into the dripolene. Prior to the change at Seadrift any ethyl acrylate was, from its first use in 1959, destroyed in the cracking furnaces before it could get into the ethylene stream. No ethyl acrylate of any significance could have survived the cracking furnace heat to which it was subjected before June, 1963. The earliest time at which ethyl acrylate could have reached any Neville plant as part of U–171 was early August, 1963.

In October, 1963, personnel at Neville's Anaheim plant began receiving serious complaints from the Flintkote Company branch in California. Flintkote used Neville's resin to make floor tile, and several of Flintkote's customers were complaining to it about an unusual, persistent and intolerable odor in the floor tile which had been manufactured from Neville's resin. Neville's President, Lee V. Dauler, immediately went to the West Coast to investigate. Thereafter, in November, 1963, he went to New York City and met with Carbide officials. Mr. Dauler advised Carbide of the Flintkote complaints and told Carbide he suspected a change had been made in U–171. A sample of the malodorous Flintkote tile was left with Carbide for analysis. Carbide did not ad-

---

1. Notice to Carbide personnel was given by a memorandum dated May 31, 1963 and circulated in the Seadrift plant, which stated that: * * * "As our knowledge of the hazards of acrylate increases, we can operate our plant at maximum profit while handling the acrylate with the care it deserves as a reactive chemical. * * *

The Institute Plant, which processes our dripolene, has been alerted that the Seadrift dripolene will contain small quantities of acrylate. They have agreed to accept the material on a trial basis and will let us know if any problems arise. * * * "

vise Neville of the results of its analysis.

Although Neville claimed that the October, 1963, complaint was the first serious odor complaint, Neville described at least one floor-tile complaint from Flintkote before August, 1963, and conceded that before mid-July, 1963, Flintkote had asked for a "deskunking" of Neville's resin.[2] In January, 1964, personnel at the Neville Island plant began receiving numerous complaints from customers in Eastern United States and Canada who had purchased resin made from U–171 and used it in the manufacture of material for shoe soles, paper packaging products, rubber matting, pigments for printing inks, paints and varnishes. There were, however, customers of Neville who used resins made from U–171 during this same period and did not complain, including Armstrong Cork, which like Flintkote used Neville resin in manufacturing floor tile.

Neville stopped purchasing U–171 after December, 1963.

Investigation by Neville and its customers established that after the various end products made with resins containing U–171 were distributed, they developed an intolerable odor, which persisted for long, indeterminate periods of time. Efforts to mask or otherwise abate the odor proved fruitless.

During 1964, Mr. Dauler and D. W. Kelso, Vice President and Treasurer of Neville, wrote several letters to Carbide advising of the claims asserted and the litigation threatened against Neville. On July 17, 1964, Neville's counsel wrote to Carbide setting forth the number and gravity of the claims, listing each of the complaining customers, the dollar amount of each claim, and notifying Carbide of Neville's claim against it for full reimbursement of amounts paid in respect of such claims and related costs. In reply to these communications, Carbide denied any responsibility in the matter, refused to provide any information to Neville regarding the possible cause of the odor problem, and did not advise Neville of any change in its process of manufacturing U–171. Neville investigated and then settled its customers' complaints and claims.

Neville brought suit on July 20, 1965, under diversity jurisdiction, charging Carbide with negligence in allowing ethyl acrylate to enter the dripolene, and failing to notify Neville of the change, with breach of its express warranties, and with breach of the implied warranties of merchantability and fitness for a particular purpose. Neville sought to recover $696,534 it paid to settle claims asserted by customers which had purchased its resin; $128,075.40 in interest on this amount; $53,965 claimed from Neville by Liberty Mutual Insurance Company for money paid to Beebe Rubber Company, a customer of Neville; $281,063 it claimed was spent on technical research, settlement expenses, and disposition of defective materials; and $1,519,145 estimated loss of profits for a ten year period.

Carbide counterclaimed for the cost of merchandise which had been shipped to Neville and not paid for, and for the loss of profits sustained by it because Neville refused to accept the remaining U–171 which Neville had contracted to purchase.[3]

The case was tried in two stages before Judge Gerald J. Weber and a jury. In the first stage, all issues as to liability were submitted to the jury on special interrogatories. In answer to 15 interrogatories, the jury found: (1) the contact with ethyl acrylate during Carbide's processing was the proximate cause of the odor which made Neville's resin un-

---

2. The record refers to approximately six complaints that had been made to Neville before mid-July.

3. Carbide filed a pre-trial motion to join Maryland Casualty Company as a real party in interest on the ground that a substantial part of the claims paid to Neville's customers were paid by Neville's insurer, Maryland Casualty Company. The motion was denied.

acceptable to users; (2) Carbide was negligent in delivering such material to Neville; (3) Carbide was negligent in failing to notify Neville of the change in its process; (4) there was no negligence on the part of Neville which contributed to the odor problem; (5) Neville did not assume the risk of objectionable odor; (6) Carbide did not breach its contract with Neville to supply Neville with the material agreed upon; (7) Carbide agreed to deliver material conforming to a sample labeled "UO–171" and (8) failed to do so; (9) Carbide agreed to deliver material substantially conforming to the material delivered by barge loads in 1961 and 1962 and (10) failed to do so; (11) Carbide agreed to deliver material that "had been identified by a verbal description which identified the material" and (12) did deliver such material; (13) Carbide failed to deliver material which would pass as a resin former oil without objection in the trade or was of fair average quality or which was fit for the ordinary purposes of such material in the trade; (14) Carbide had reason to know of Neville's particular purposes for the material, Neville relied on Carbide's skill and judgment, Carbide had reason to know this; and (15) Carbide failed to supply material fit for Neville's purposes.

After the jury made its findings on liability, the issues of damages were tried and the jury returned a verdict for the plaintiff in the amount of $2,151,534.

Carbide filed post trial motions for judgment notwithstanding the verdict, alterations and amendment of judgment and a new trial.[4] The motions for judgment n.o.v. and a new trial were denied by Judge Weber. 294 F.Supp. 649 (W.D.Pa.1968). This appeal followed.

■ The basic question presented on this appeal is whether the District Court properly refused to grant defendant's motion for judgment notwithstanding the verdict, pursuant to Rule 50(b), Federal Rules of Civil Procedure. Such a motion may not be granted unless as a matter of law it is found that Neville failed to present a case for the jury, and a verdict in Carbide's favor should have been directed at the end of the trial. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 250, 61 S.Ct. 189, 85 L.Ed. 147 (1940); 2B Barron & Holtzoff, Federal Practice & Procedure § 1079, p. 414 (1961).[5]

Carbide advances the following reasons in support of its motion for judgment notwithstanding the verdict:

I. Neville failed to prove a prima facie case of causation.

II. Neville failed to prove negligence, or to establish a breach of warranty.

III. The terms of the contract between Neville and Carbide preclude liability to Neville for either breach of warranty or negligence.

IV. The damage verdict was improper because its various elements were not legally recoverable.

Before reaching any of Carbide's contentions, the question of what state law governs the various issues in this case must be discussed. The parties and trial court apparently assumed without discussion that Pennsylvania law controlled.

■■ A federal court in a diversity case must apply the conflict laws of the state in which it is sitting. Klaxon Co. v. Stentor Elevator Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Pennsylvania Supreme Court follows the modern approach and looks to

---

4. Careful examination of the evidence and the findings of the jury supports the judgment of the District Court in dismissing the second cause of action of Carbide's counterclaim.

5. The standards for granting a motion notwithstanding the verdict and a motion for a directed verdict are the same. Gatenby v. Altoona Aviation Corp., 407 F.2d 443 (3d Cir. 1968); Mihalchak v. American Dredging Co., 266 F.2d 875 (3d Cir. 1959), cert. denied, 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed.2d 157; 2B Barron & Holtzoff, Fed.Practice & Procedure § 1075 at 375, § 1079 at 412 (1961).

the law of the place with the most significant relationship to the parties and the transaction, on each issue, or the "center of gravity" of the contract. Griffith v. United Airlines, Inc., 416 Pa. 1, 203 A.2d 796 (1964); Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A. L.R.2d 246 (1954) cited in Griffith, 416 Pa. at 20 n. 13, 203 A.2d at 805 n.13. *See also* Slaughter v. Philadelphia National Bank, 417 F.2d 21, 26 n.8 (3d Cir. 1969).

█ Pennsylvania has the greatest interest in applying its laws to both the liability and damage issues before this Court. It is the place of negotiation of the contract, the place where the plaintiff, Neville, signed the contract, the principal place of business of Neville, the party seeking damages, the place where a portion of the contract was performed, and the forum state. Although Carbide signed and drafted the contract in New York, and part of the material was delivered to California directly from Carbide's West Virginia plant, the interest of these states is considerably weaker. Under *Griffith*, reliance by the parties on the law of a particular state is also a consideration in making a choice of law, and it is reasonable to believe that the parties here contemplated the application of Pennsylvania law. This appears to be particularly so in view of the lack of dispute on this point.[6]

I

Carbide contends that a directed verdict should have been entered against Neville because Neville failed to prove a prima facie case establishing that the ethyl acrylate Carbide allowed to enter the ethylene stream was the proximate cause of Neville's odor complaints. To support this argument Carbide relies heavily on the decision of this Court in

Denneny v. Siegel, 407 F.2d 433 (1969), affirming a directed verdict granted in favor of defendant under Rule 50 by the District Court because the plaintiff failed to produce the necessary evidence to establish the negligent act as the proximate cause of the injuries sustained.

It should be noted that the parties here, unlike those in *Denneny*, have not addressed themselves to the issue whether state or federal standards are to be employed to test the sufficiency of the evidence required to establish a prima facie case. We assume, therefore, that they read the *Denneny* opinion as saying that there is no difference between the federal standard applied in this Circuit in diversity cases and the standard applied by the Pennsylvania state courts.

█ In *Denneny*, this Court after observing the lack of uniformity among the circuit courts on this point, as well as the conflicting decisions in this circuit, nonetheless declined to pass on the issue, since an examination of federal and state standards on the evidence necessary to establish medical causation, the critical issue in that case, revealed that they were substantially similar. We adhere to this determination.

The Pennsylvania test, as stated in Smith v. Bell Telephone Co. of Pa., 397 Pa. 134, 153 A.2d 477 (1959) was summarized in *Denneny* as requiring "the trial judge [to] determine as a minimum requirement of a prima facie case whether the plaintiff has produced 'substantial evidence' of 'sufficient facts' having the capacity of supporting a logical conclusion." (footnotes omitted). 407 F.2d at 440.

The federal rule, according to the decision in *Denneny*, is similar to the one in the *Smith* case. It requires that we "determine whether, as a matter of law,

---

6. As to questions involving the application of the Uniform Commercial Code, Section 1–105(1) provides:

"Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties

may agree that the law either of this state or of such other state of nation shall govern their rights and duties. Failing such agreement this Act applies to transactions bearing an appropriate relation to this state." 12A P.S. § 1–105(1) (Supp.1969).

the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." [7] 407 F.2d at 439. *Accord,* Rumsey v. Great Atlantic & Pacific Tea Co., 408 F.2d 89, 91 (3d Cir. 1969) (*en banc*).

Relying on the standard of proof endorsed in *Denneny,* Carbide argues that Neville, like Mrs. Denneny, has failed to prove a prima facie case of causation. After a careful examination of the record in this case, we conclude that *Denneny* is not controlling.

In *Denneny,* the wife-plaintiff, who had suffered from a post-operative infection, brought suit against the attending physician and hospital alleging the infection was the result of the negligence of the hospital in permitting a person in unsterile street clothes to help wheel the plaintiff into the operating room. At trial, the plaintiffs' two medical experts were asked what caused this particular infection. One replied that by the time she examined the patient "it was impossible to determine the cause [of the infection]". The other expert stated that the infection could have been caused by any one of a number of things which he enumerated. He *did not* mention plaintiff's contact with a person in unsterile clothes. The only other evidence that plaintiff produced was a laboratory report showing the presence of "staphylococcus" in the infection. 407 F.2d at 436. The district court held that expert testimony was needed to establish a causal link between staphylococcus in the surgical wound and contact with the person in unsterile clothes who wheeled the plaintiff into the operating room. This Court affirmed the lower court's decision because: "No attempt was made to establish that any of the organisms found in the laboratory specimen *could have* resulted from the momentary presence in the operating room of a person in street clothing." (emphasis added) 407 F.2d at 442.

The type of testimony in *Denneny* and that presented by Neville are not analogous. Three expert witnesses, Dr. George E. Foltz and Dr. Amos Turk and Dr. Claibourne E. Griffin, testified unequivocally that in their opinions Neville's odor problem was caused by the norbornene ester in U–171.[8] Dr. Turk,

---

7. An articulate statement of the federal standard in diversity cases was made by the Fifth Circuit, following an exhaustive survey, in Boeing Company v. Shipman, 411 F.2d 365 (5th Cir. 1969). After a re-hearing *en banc* the Fifth Circuit, which previously had held that in a diversity case the federal standard of sufficiency of the evidence must be applied, stated as follows:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question." 411 F.2d at 374–375. In *Boeing,* the Fifth Circuit reversed its earlier rule, noted in *Denneny,* 407 F.2d at 437 n. 8, that the federal standard in diversity cases was the same as that in FELA cases.

8. Neville's witnesses were firm in their opinion as to the cause of the odor problem.

Dr. Foltz: (A. 322a) :

Q. "Now, Dr. Foltz, based upon your experience as an organic chemist and the work which you did on U–171 between November, 1963, to date, do you have an opinion as to what was the

Professor of Organic Chemistry at CCNY, and an authority on air pollution and odors, testified regarding the consequences which occur when ethyl acrylate comes into contact with dripolene. He stated that ethyl acrylate reacts with components of dripolene (cyclopentadiene and dicyclopentadiene) to form nerbornene ester, and that gradually over a period of time after the resin has been manufactured into end products, the norbornene ester is released, producing an odor described as valerian.[9] This is known in chemical literature as a Diels-Alder reaction.[10] Dr. Foltz, an organic chemist employed by Neville, testified that he isolated and identified norbornene ester as the "smelly" component in U–171.

■ The plaintiff in this case, unlike Mrs. Denneny, provided the Court with testimony describing the consequences of the defendant's actions, and produced credible evidence that the harm which the plaintiff suffered resulted from the defendant's acts. This link was glaringly absent in the expert testimony in *Denneny*.

Carbide further contends that the jury's verdict linking Neville's odor problems to Carbide's changed method of manufacturing U–171, is not support-

cause of the odor complaint which Neville Chemical Company received from its customers about resin made from U–171?

\* \* \* \* \*

A. I believe it was the ethyl norbornene ester that was received in our U–171."

Dr. Griffin (A. 421a):

Q. "Now, Doctor, as an organic chemist with a specialty in the identification of chemical substances, and based upon the work that you conducted on the U–171, on resin made from U–171, and on end products manufactured from U–171, do you have an opinion as to the cause of the odor complaints which Neville Chemical Company received in the late Fall of 1963 and early 1964?"

\* \* \* \* \*

The Witness: Yes, I do.

\* \* \* \* \*

Q. "Would you give us your opinion, Doctor?

A. "Based on the increasing content of the norbornene ester that develops in the samples of U–171 late in 1963, I think that this odor problem is distinctly associated with the introduction of the ethyl acrylate into the U–171 feed. There appears to be nothing else introduced into the U–171, which is essentially foreign to that material.

"That material is typified by the U–171 samples which give perfectly satisfactory end products. So I feel that it is the introduction of the ethyl acrylate, and the resulting reaction of the ethyl acrylate with cyclopentadiene to give heavy products which decompose over a long period of time that is responsible for this odor problem."

Dr. Turk (A 485a):

Q. "As an organic chemist with a PhD Degree in this particular field and based upon your specialty in odor evaluation, your chairmanship of the ASP Committee on Odor Evaluation, do you have a professional opinion as to the cause of the odor complaint which Neville experienced in 1963 and 1964?

A. Yes, I have an opinion.

Q. "And what is that opinion, Doctor?

A. "Well, the opinion is that the odor complaints were occasioned by the inclusion by Union Carbide of ethyl acrylate in the feed stream of U–171 and then the reaction of this ethyl acrylate with cyclopentadiene to form the ester which is highly odorous and then the further reaction with this ester with cyclopentadiene to lock it up, in a sense, in a higher molecular weight material and the gradual reversal of this reaction to leak it out and again cause the norbornene ester to come out into the atmosphere under conditions where it would be offensive to people."

9. Dr. Foltz described "valerian" as being the odor of "dirty socks, putrid, obnoxious".

10. Dr. Turk is the first chairman of the Committee of Sensory Evaluation of Materials and Products of the American Society for Testing of Materials (ASTM). He is consultant to public agencies regarding air pollution; consultant to industry in measurement and control of odor; holder of several patents and author of about 75 articles. His doctoral dissertation was on the Diels-Alder reaction; and indeed, he had been employed by Carbide in another matter.

ed by the evidence, because Carbide had another, and in its opinion, more consistent explanation of the odor. It was Carbide's position that the odor causing the complaints was occasioned by the dicyclopentadiene in the dripolene, and not by the norbornene ester. Dr. Edward Caflisch, an organic chemist for Carbide who had worked with dripolene since 1962, and Dr. Edward Lewis, Chairman of the Chemical Odor and Taste Panel for Carbide, testified that this was the cause of the complaints. Carbide attributed the odor to Neville's failure to "strip" (remove by heat distillation) more of the odoriferous components of its raw materials than was necessary to achieve the consistency desired for resin making. If Neville had "stripped" to a high boiling point, Carbide contended, the chemicals that caused the smell would have been boiled off.

Carbide claims this explanation is the only one consistent with the evidence that Neville had experienced complaints before Carbide changed its processing of dripolene, and with the fact that not all of Neville's customers complained.

Carbide also argues that since the proof of its explanation of the cause of the odor was supported by the experiments of its odor panel and Neville's proof was established by expert opinion alone, and not by an odor panel, the jury's verdict cannot be accepted. In this regard, Carbide points out that Neville had established an odor panel under the direction of Dr. Turk, but that the results of Neville's panel were not intro-

duced into evidence. These facts, however, indicate only that evidence regarding causation was not all one way, and, indeed, was vigorously contested. But the points defendant now makes could have been argued to the jury by counsel at trial.

The experts, contrary to Carbide's contention, did testify that the norbornene ester and *not* the other "smelly" ingredients in the resin caused the odor complaints. Carbide's objection to the method used by Neville's experts was noted by Carbide's witness, Dr. Caflisch.

Additional circumstantial evidence lends further support to the jury's verdict. Customers of the product sold from both the Neville Island and the Anaheim plants complained. The processing in these two plants was different, but a common ingredient was U–171. The problems which Neville characterized as serious occurred only as to those resins made with the U–171 which could be traced to the dripolene from Carbide's Seadrift plant—the only dripolene which came in contact with ethyl acrylate. With the exception of the few earlier complaints,[11] the odor problem occurred after Carbide permitted ethyl acrylate to enter dripolene, and ceased when Neville produced resin without "U–171".

The jury was entitled to believe testimony by Neville's witnesses that the earlier odor complaints were "not serious and basically different from those received after Carbide changed its process of making U–171".[12] The fact that

---

11. It should be noted that Neville settled no claim arising from these earlier complaints.

12. On cross examination, Dr. Turk distinguished between the odor of norbornene ester and the odor of dicyclopentadienes and cyclopentadienes in the "U–171" (A 492a):

Q. "And they are smellable, aren't they?
A. "Yes, they are.
Q. "So that all the time this decomposition is going on you are smelling dicyclopentadienes?

A. "Well, I said dicyclopentadiene or cyclopentadiene.
Q. "Or cyclopentadiene?"
A. "Does have an odor, of course, the odor is much less intense and much, much less objectionable, than in the ester. The ester has a special objectionability all its very own. If you are saying that some cyclopentadiene could come off with the other material, I would agree with you.
Q. "Yes, but if you would be smelling cyclopentadiene?
A. "If you are subjected in the room, say, where tile was decomposing on the

every user of a resin made with the same U–171 did not complain is also not an adequate basis for disturbing the jury's verdict which, when the evidence is examined in the light most favorable to Neville, as required, Gatenby v. Altoona Aviation Corp., 407 F.2d 443 (3d Cir.1968); Mihalchak v. American Dredging Co., 266 F.2d 875 (3d Cir. 1959), is otherwise supported by sufficient scientific and circumstantial evidence.

## II

Carbide's motion for judgment n. o. v. also attacked the sufficiency of the evidence supporting the jury's findings of negligence. Although little attention was devoted in the briefs or oral argument to this issue, we nonetheless are constrained to refer to it.

In answer to interrogatories two and three, the jury found Carbide negligent in allowing the ethyl acrylate to come into contact with the dripolene and in failing to notify Neville of the change in its process. There is adequate evidence in the record to support these findings.

Neville's expert witnesses testified that the reaction between ethyl acrylate and dicyclopentadiene or cyclopentadiene in dripolene is well established in chemistry and is in fact practically an inevitable one. They also testified that the bad odor of norbornene ester is described in chemical literature, and that it is unstable and decomposes over a long period of time, pursuant to the Diels-Alder reaction which is "so well known that a chemistry sophomore is aware of it". The decomposition was a slow process and would not have occurred until after Neville manufactured its resins and shipped them to customers. The odor was not readily discoverable in the U–171 because the norbornene ester was "locked up" in the U–171 after it combined with more dicyclopentadiene to produce a combination which has no odor. Thus, Neville had no opportunity to discover the odor and to take action to safeguard its product.[13]

Carbide's witness, Dr. Caflisch, did not disagree with the scientific testimony regarding the chemical reactions and decomposition. Thus, there is ample evidence that Carbide should have known of this reaction and the possible harm it could cause Neville.

In addition to the circumstantial evidence of Carbide's knowledge of the possible risk, there was in the record the intercompany memorandum to Carbide's own personnel noting the change[14] instituted to increase Carbide's profits and warning personnel to look for any possible problems. Carbide explained the memorandum as a warning of handling problems only; but apparently the jury did not accept this explanation.[15]

In its motion for judgment n. o. v., Carbide contended that the finding of negligence was improper because there was no evidence in the record of the standard of care used in the industry for disclosure of such information. Carbide, in fact, argued that since Neville itself did not disclose information to its

floor to the gradual accumulation of some cyclopentadiene and some norbornene ester you wouldn't notice the cyclopentadiene, all you would notice is the sour-type sweat-type odor of the ester.

Q. "The ester would mask the dicyclo odor?

A. "Yes.

Q. "But if the ester would not be released at any given time, then you would smell the dicyclo odor?

A. "Of course, this is not sufficient, if there was no ester then you wouldn't smell anything.

Q. "But both of the odors, the ester and the dicyclo odor, are things that would persist over a long period of time?

A. "Well, they are not in the same league * * *"

13. Dr. Turk testified that without knowledge of the presence of ethyl acrylate, Neville would be extremely unlikely to adjust its process of making resin to prevent the odor problem.

14. See note 1 *supra*.

15. Even if the jury did lend credence to Carbide's explanation of the memorandum, such would not undermine their ultimate findings.

customers about changes in its processes, Carbide should not be charged with having a duty to do so. This, however, is invalid reasoning. When one makes possible a situation which creates an unreasonable risk of harm to another, the fact that others also do so is not an absolute defense. Evidence of the customary practice within the industry although admissible is not essential to a finding of negligence. Indeed, as stated by the trial judge, evidence of what usually is done is not necessarily what ought to be done, and is therefore not necessary to prove negligence. 294 F. Supp. at 654. *See e. g.* McAdoo v. Autenreith's Dollar Stores, 379 Pa. 387, 392, 109 A.2d 156 (1954); Maize v. Atlantic Reef Co., 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449 (1945). Harper and James, The Law of Torts § 17.3 at p. 977–82 (1956).

### III

Having concluded that there was sufficient evidence to support the jury's finding that Carbide was negligent and that this negligence was the proximate cause of Neville's odor problem, we must decide whether Carbide could and did insulate itself against, or limit, its liability to Neville by the contract covering the sale of the U–171. The pertinent language of the contract is as follows:

*Paragraph 7*

"Failure of Buyer to give notice of any claim with respect to any material delivered hereunder within fifteen (15) days after the receipt of such

material shall be an unqualified acceptance of such material and a waiver by Buyer of all claims with respect thereto. Buyer assumes all risk and liability for the results obtained by the use of any material delivered hereunder in manufacturing processes of Buyer or in combination with other substances. No claim of any kind, whether as to material delivered or for nondelivery of material, shall be greater in amount than the purchase price of the material in respect of which such claim is made."

In the first sentence of Paragraph 9 of the contract, it is provided:

"This Agreement contains all of the representations and agreements between the parties hereto and no warranties shall be implied."

 The general rule on this point established by Pennsylvania case law is that a private party may validly contract to relieve himself from liability for the consequences of his own negligent acts. Galligan v. Arovitch, 421 Pa. 301, 304, 219 A.2d 463 (1966); [16] Dilks v. Flohr Chevrolet, 411 Pa. 425, 433, 192 A.2d 682 (1963); Cannon v. Bresch, 307 Pa. 31, 160 A. 595 (1932); Perry v. Payne, 217 Pa. 252, 66 A. 553, 11 L.R.A.,N.S., 1173 (1907). However, there is no doubt that the law is and perhaps always has been that "contracts against liability for negligence are not favored by the law", and will be construed strictly, with every doubt resolved against the party seeking their protection. Crew v. Bradstreet Co., 134 Pa.

---

16. Neville urges this Court to rule that Section 1–102(3) of the Uniform Commercial Code, 12A P.S. Section 1–102(3) (Supp.1969) precludes all contracts limiting liability for negligence. This Section states: "The effect of provisions of this Act may be varied by agreement, except as otherwise provided in this Act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement but the parties may by agreement determine the standard by which the performance of such obligations is to be measured if such standards are not manifestly unreason-

able; * * *" Neville also calls attention to the Pennsylvania Bar Association Notes which were included with the Code by the Pennsylvania legislature. These Notes state that this section probably modified Lachman Co. v. Hercules Powder, 79 F.Supp. 206 (E.D.Pa.1948). These Notes, however, were not reenacted in the 1959 revision of the Code. Because we *decide* that even under the Pennsylvania case law, this disclaimer was not effective to bar Neville's recovery, we do not decide a question more properly for the state courts. *But see* Vlases v. Montgomery Ward & Co., 377 F.2d 846, 850 (3d Cir. 1967).

161, 169, 19 A. 500, 7 L.R.A. 661 (1890). This is particularly so where such party has drafted the contract. Galligan v. Arovitch, *supra*; Employers Liability Assurance Corp. v. Greenville Business Men's Ass'n., 423 Pa. 288, 224 A.2d 620 (1966); Dilks v. Flohr Chevrolet, *supra*; Pittsburgh Steel Co. v. Paterson-Emerson-Comstock Inc., 404 Pa. 53, 171 A.2d 185 (1961); Morton v. Ambridge Borough, 375 Pa. 630, 101 A.2d 661 (1954).

The question that we must address ourselves to therefore is the specificity of the language required to disclaim or limit responsibility for negligence. The Pennsylvania test for evaluating the required language is set forth in Dilks v. Flohr Chevrolet and Employers Liability Assurance Corp. v. Greenville Business Men's Ass'n.[17] After reviewing the Pennsylvania cases on exculpatory contracts, the Court in Dilks said that (411 Pa. 436, 192 A.2d at 688):

"* * * where a person claims that, under the provisions and terms of a contract, he is rendered immune from and relieved of any liability for negligent conduct on his part or on the part of his employees, the burden is upon such person to prove (a) that such contractual provisions and terms do not contravene public policy and (b) that the provisions and terms of the contract *clearly* and *unequivocally* spell out the *intent* to grant such immunity and relief from liability. Absent such proof, the claim of immunity fails."

In *Employers Liability Assurance*, the Court also reviewed the required language in contracts seeking to give parties immunity from negligence and said it "* * * 'must spell out the intention of the parties with the greatest of particularity' (Morton v. Ambridge Borough, 375 Pa. 630, 635, 101 A.2d 661, 663 (1954)) and * * * '[n]o infer-

ence from words of general import can establish it'. (Perry v. Payne, 217 Pa. 252, 262, 66 A. 553, 557 (1907)); * * *". 423 Pa. at 292, 224 A.2d at 623. *See also* Pittsburgh Steel Co. v. Patterson-Emerson-Comstock; Westinghouse Electric Co. v. Murphy, Inc., 425 Pa. 166, 228 A.2d 656 (1967). Cf. Jamison v. Ellwood Consolidated Water Co., 420 F.2d 787 (3d Cir., 1970).

▮ The first provision on which Carbide relies to bar its liability is the fifteen day notice requirement. This requirement is manifestly unreasonable if it is construed to require that notice be given of *latent* defects which would not be discoverable until after the time specified has elapsed. The crux of the jury's finding of negligence is that Carbide shipped Neville a product knowing or having reason to know it was likely to cause an obnoxious odor after Neville processed it into resin and sold the resin to its customers. We do not agree that the time limitation for notice of claims was intended to apply in these circumstances. Such an interpretation would be inconsistent with the rule that a party is immunized from the consequences of his own negligence only by clear and unequivocal language expressing that intent.

The same result would follow under the Uniform Commercial Code. The trial court decided that the notice requirement was ineffective under Section 1–204(1) of the Uniform Commercial Code, which states that "Whenever this Act requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement." Just as a seller of tulip bulbs from Holland could not bar claims against it for defective bulbs by requiring notice before the bulbs would normally bloom, Vanderberg & Sons, N. V. v. Siter, 204 Pa.Super. 392, 204 A.2d 494 (1964), Carbide could not require notice

---

17. The law in California and New York on the construction of exculpatory language is basically the same as Pennsylvania's. *See* Basin Oil Co. v. Baash-Ross Tool Co., 125 Cal.App.2d 578, 271 P.2d 122 (1954); Willard Van Dyke Productions, Inc. v. Eastman Kodak Co., 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693 (1963) and the cases cited therein.

of a defect in its chemical products at a point in time at which it was impossible to discover the defect. 294 F.Supp. at 655.

Although there is some question whether the Uniform Commercial Code is applicable to this point, since here we have a jury finding of negligence as distinguished from a mere breach of a warranty, nonetheless, there is no reason on this record to distinguish between the reasonableness of a notice requirement effective to bar recovery for contract claims and that effective to bar recovery for negligence claims.

Carbide does not dispute the principle that exculpatory language must be clear and unequivocal, but urges this Court to follow three cases which decided that certain clauses, which Carbide contends are analogous to the language in the contract here, immunized it from the consequences of its own negligence: Cannon v. Bresch, 307 Pa. 31, 160 A. 595 (1932); Shafer v. Reo Motors, 205 F.2d 685 (3d Cir.1953); and Lachman v. Hercules Powder Co., 79 F.Supp. 206 (E.D.Pa.1948).

The Pennsylvania Supreme Court held in Cannon v. Bresch that a clause in a lease which stipulated that a landlord was released "from all liability for any and all damage caused by water" was applicable where damage was caused by the landlord's negligence. However, we do not consider that every time the word "all" is used in a disclaimer of liability the language will be interpreted as a clear intent to insulate the party

writing it from responsibility for negligence. In Cannon the exclusion of liability was quite specific: it limited liability for water damage only. Hence, there was no broad general statement attempting to disclaim responsibility for negligence of all kinds. The particular nature of the type of damage was undoubtedly the basis for the broad interpretation of the word "all" by the Court.

Lachman v. Hercules Powder is perhaps Carbide's strongest case. There, the district court recognized the interest of a chemical company in limiting its liability and held that language similar to that in the U–171 contract, but somewhat more explicit, exculpated the defendant from liability for negligence.[18] Despite this case, which was decided prior to the enactment of the Uniform Commercial Code, we do not believe that the language in Carbide's contract was *"clear and unequivocable"* as explicitly required by the Pennsylvania Court in Dilks v. Flohr Chevrolet.[19]

In Shafer v. Reo Motors, which quoted from Cannon and Lachman, the defendant sold a truck with a "standard warranty" promising to replace defective parts. The contract stated that "this Warranty [is] in lieu of all other Warranties expressed or implied and of all other obligations or liabilities on our part. * * *" This Court held the limitation of liability effective to restrict plaintiff's recovery to replacement of the defective parts, as distinguished from general damage, although the parts were defective because of the defendant's negligence. 205 F.2d at 687, 688.[20]

---

18. The word "whatsoever" in the *Lachman* contract is not present in the Carbide-Neville contract.

19. In *Lachman*, Judge Kirkpatrick interpreted the assumption of risk language in conjunction with a clause disclaiming implied and express warranties. He said "[The] risks were already fully eliminated by the first clause of the sentence that 'Seller makes no warranty of any kind, express or implied, except that the materials sold hereunder shall be of Seller's standard quality.'" This modification of implied warranties would be ineffective

under Section 2–317 of the Uniform Commercial Code of Pennsylvania. In order to disclaim the warranty of merchantability § 2–317 requires that the word "merchantability" appear.

20. *But cf.* Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960), in which the Supreme Court of New Jersey struck down an attempt to limit the damages recoverable for breach of warranty. The same principles are apparently applicable to limitation for negligent conduct. *Henningsen,* was cited by the Pennsylvania Superior

Carbide argues that the strict construction of exculpatory language is reserved for contracts of adhesion where there is a disparity in the bargaining power between the parties. This is questionable since Dilks v. Flohr Chevrolet and *Employers Liability Assurance* each involved a dispute in a commercial setting between a lessor and a business tenant.

In United States v. Kelly, 236 F.2d 233 (8th Cir.1956), the Court did not permit a contract which stipulated that the subject material was sold "as is" to preclude recovery by a buyer for the seller's negligence. In *Kelly,* refuse sold to the plaintiff as feed for his cattle contained poison which had been negligently included with the refuse. The cattle died and plaintiff sued under the Federal Tort Claims Act. The Government, as does Carbide here, sought to bar recovery by pointing to an exculpatory clause in the contract of sale. But the Court decided the stipulation in the contract that the refuse was offered for sale "as is" and "where is" and "without recourse on the Government" did not mean that the buyer assumed the risk of the seller's negligence. 236 F.2d at 236.[21]

If there is any doubt as to the meaning of an exculpatory clause, the party seeking its protection cannot be said to have carried his burden.

Strict construction of exculpatory clauses is also indicated by the Uniform Commercial Code which requires sellers use very specific language in order to modify or disclaim liability to purchasers for a breach of the implied warranties. The implied warranty of merchantability [22] can be excluded or modified only by language that mentions the word "merchantability", or by the words "as is", "with all faults" or "other language which \* \* \* makes plain that there is no implied warranty \* \* \*".[23]

Court as a "leading case in products liability." MacDougall v. Ford Motor., 214 Pa.Super. 384, 257 A.2d 676 (1969).

21. *See also,* Celanese Corp. of America v. John Clark Ind., 214 F.2d 551, 554 (5th Cir. 1954).

22. Section 2–314(1) "Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
(2) Goods to be merchantable must be at least such as
(a) pass without objection in the trade under the contract description; and
(b) in the case of fungible goods, are of fair average quality within the description; and
(c) are fit for the ordinary purposes for which such goods are used; and
(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) are adequately contained, packaged, and labeled as the agreement may require; and
(f) conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (Section 2–316) other implied warranties. may arise from course of dealing or usage of trade.

23. Section 2–316 (2) "Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof'.
(3) Notwithstanding subsection (2)
(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and
(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

■ The clause that Carbide relies on does not include the word negligence or any of its cognates and is essentially a clause of "general import". It says that Neville assumes "all risk and liability for the results obtained by the use of any material delivered hereunder in manufacturing processes of Buyer or in combination with other substances." Neville did not clearly assume the risk of Carbide's negligence as to material which did not conform to that in the sample barge and, hence, was not "delivered hereunder." As the jury's finding established, the odor did not result from anything in Neville's processing operation nor use of the material by Neville, but was almost an inevitable reaction from the time Carbide allowed the ethyl acrylate to enter the dripolene.[24] The clause is not appropriate to place the risk on Neville that Carbide would change its process without notifying Neville of such change, in a manner making it likely an unmerchantable resin would result.

The last sentence of paragraph 7 of the Contract, which limits claims to the return of the purchase price, is also a general disclaimer. It is not clearly and unequivocally applicable to negligence of the type present on this record. The last two sentences of paragraph 7 are complimentary and we cannot say that the latter one clearly excluded what the previous one did not.

Nor can we accept Carbide's argument that paragraph 7 meant nothing if it did not limit liability for negligence under these circumstances. The provision could be an attempt to limit damages which occurred in excess of the purchase price as a result of a breach of contract. *See,* Willard Van Dyke Productions, Inc. v. Eastman Kodak Co., 12 N.Y.2d 301, 239 N.Y.S.2d 337, 189 N.E.2d 693 (1963); Becker Pretzel Bakeries, Inc. v. Universal Oven Co., 279 F.Supp. 893 (D. Md.1968); Pipe Welding Supply Co. v. Gas Atmospheres, Inc., 201 F.Supp. 191 (N.D.Ohio, 1961); Basin Oil Co. v. Baash-Ross Tool Co., 125 Cal.App.2d 578, 271 P.2d 122 (1954). Whether it was effective for this purpose is a question we do not have to reach[25] since the

(c) an implied warranty can also be excluded or modified by course of dealing or course or performance or usage of trade.

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2–718 and 2–719)."

24. A strict interpretation of exculpatory language was made in Watsontown Brick Co. v. Hercules Powder Co., 265 F.Supp. 268 (M.D.Pa.1967) aff'd 387 F.2d 99 (3d Cir. 1967). An agreement between Hercules Powder Co. and Watsontown Brick by which Hercules agreed to supply the services of its personnel to assist its customers in using the explosives sold, contained a clause that "all work and services so performed shall be at the sole risk and responsibility of the [customer] and for any damage or loss resulting from such services, * * * the [customer] expressly agrees to indemnify and hold harmless Hercules * * * and further to assume sole responsibility for the result of the services of such employes or equipment gratuitously furnished by * * * Hercules Company," 387 F.2d at 100, n. 1. The Court held that this agreement did not relieve Hercules from its own negligence in sending Watsontown an incompetent employee.

25. Judge Weber decided that the limitation of claims to the purchase price was ineffective to limit Carbide's liability on any theory. In doing so, he relied on the rules of the Uniform Commercial Code, and the cases thereunder. He decided that under Section 2–719 an attempt to limit recovery to the purchase price was inapplicable if there were a latent as opposed to patent defect. Section 2–719 states:

(1) "Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement

jury specifically found negligence in this case.

In view of our holding which finds evidence to support that portion of the jury's verdict finding Carbide negligent and in view of our position that Carbide did not exculpate itself from liability for negligence on this record, it is unnecessary to consider Carbide's arguments attacking the jury's findings relating to a breach of the express and implied warranties of the contract.

Carbide appeals the denial of its motion for a new trial as well as the denial of its motion for judgment n. o. v. A motion for a new trial on the ground that the verdict is against the weight of evidence is particularly within the discretion of the trial judge and only in very clear cases will an appellate court say that he abused his discretion. Silverlii v. Kramer, 314 F.2d 407 (3d Cir. 1963); Mihalchak v. American Dredging Co., 266 F.2d 875, 876 (3d Cir.1959) cert. denied, 361 U.S. 901, 80 S.Ct. 209, 4 L.Ed.2d 157.

In addition to its claim that the weight of the evidence was in its favor, Carbide contends that inconsistencies in answers to the interrogatories and the denial of its request for special factual verdict forms, compels the Court to grant its motion for a new trial on liability. We disagree.

Although we do not necessarily approve of the form of interrogatories used and recognize there are inconsistencies in the answers, in light of our decision which in effect upholds the jury's finding of negligence, we do not consider them prejudicial. The inconsistencies as well as Carbide's objection to the charge of the trial judge in the liability trial pertain primarily to the question of breach of warranty and do not therefore affect the final decision on liability. Accordingly, we uphold the trial court's decision in refusing to grant a new trial on the liability issue.

## IV

This, then, brings us to a consideration of the various items of damage awarded by the jury. They are basically four in number: First, damages to recompense Neville for the payments it made to its customers, $696,534. Second, the interest on the first item $128,000. Third, damages to cover the costs of scientific research in discovering the cause of the odor and cost of settlement expense for item 1, $240,000. And fourth, damages for the loss of future profits or good will, $1,087,000.[26]

Carbide's major attack on the jury's damage verdict focuses on the amount awarded to reimburse Neville for payment made to its customers and the

of non-conforming goods or parts; and (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

The latent nature of the defect, Judge Weber indicated "cause[d] an exclusive or limited remedy to fail of its essential

purpose." In Zicari v. Joseph Harris Co., the Appellate Division of the New York Supreme Court held that the word "merchantability" must be used to limit liability for its breach under Section 2–719 or 2–316, 33 A.D.2d 17, 304 N.Y.S. 2d 918 (Dec. 12, 1969). *Compare* National Steel Corp. v. L. G. Wasson Coal Mining Corp., 338 F.2d 565 (7th Cir. 1964).

The rules of Section 2–719 apply to limiting or altering the measure of damages recoverable under the Uniform Commercial Code and may not be directly applicable to limitation of liability. for negligence.

26. The jury awarded no damages in connection with the Liberty Mutual Insurance Company claim.

amount awarded for loss of future profits caused by customer dissatisfaction.

## A.

Carbide urges this Court to grant it judgment notwithstanding the verdict on the issue of customer claim settlements because Neville did not prove its legal liability to its customers or, in the alternative, to remand the case for a new trial on these damages because the instructions to the jury were improper.

Customers of Neville resin complained that the products they manufactured and sold had a persistent and obnoxious odor caused by the Neville resin. These customers asserted claims against Neville for the value of the products they had produced with the defective resin, including those in their inventory and those resold, as well as additional damages their customers asserted against them. Some of Neville's customers' claims included an amount for the loss of future profits because of customer dissatisfaction. Evidence was presented at the special trial on damages to support the amount of damages suffered by Neville's customers and the amount Neville paid to them after it had consulted with its lawyers, and had given Carbide notice of the claims. A number of Neville's customers testified that the resin purchased from Neville containing U–171 was used to manufacture products which were unmarketable and unacceptable to their customers, that they gave their customers credits or refunds for these products and in turn made claims against Neville. Neville then asserted these claims against Carbide.

■ The parties are in agreement that the rule on indemnity in Pennsylvania is stated in Martinique Shoes, Inc. v. New York Progressive Wood Heel Co., 207 Pa.Super. 404, 217 A.2d 781 (1966), and requires that before a party can recover for a payment he made and for which another is ultimately responsible

it must appear that he was legally liable. The Pennsylvania rule was explained in *Martinique* as follows:

"In Tugboat Indian Company v. A/S Ivarans Rederi, 334 Pa. 15, 21, 5 A.2d 153, 156 (1939), our Supreme Court said, 'To recover indemnity where there has been such a voluntary payment, however, it must appear that the party paying was *himself legally liable* and could have been compelled to satisfy the claim'. This rule is more strict than that found in 18 P. L.E., Indemnity, § 11, relied on by the lower court, 'Where a claim against the indemnitee has been satisfied by a voluntary settlement, the burden is upon the indemnitee to prove that the settlement was reasonable, or, in lieu thereof, to prove the actionable facts.' The general rule as stated in 42 C. J.S. Indemnity § 25, is, 'Thus, while a person who is liable for injuries caused by the negligence or wrongful act of another may adjust and pay the claim therefor and need not wait the result of a suit in order to be entitled to indemnity from the wrongdoer, the amount claimed must be reasonable and just, and the payment must have been made in good faith, after notice to the indemnitor; *and a person so paying assumes the risk, in an action against the wrongdoer for indemnity, of being able to prove the actionable facts on which his liability depends as well as the reasonableness of the amount which he pays.*' "

The Court in *Martinique* further explained that under the Pennsylvania rule "the opinion of counsel for the indemnitee that the settlement is reasonable or advisable is not sufficient to establish such liability." 207 Pa.Super. at 409, 217 A.2d at 784.

Under the rule of *Martinique* and *Tugboat Indian Company*, a plaintiff which pays claims asserted against it can recover only those sums for which it would be legally liable,[27] not those

---

27. We note that in Wolstenholme Inc. v. Jos. Randall & Bro., 295 Pa. 131, 144 A. 909 (1929), not cited by the litigants,

the Court said it would allow recovery from the original seller for the amount of the buyer's "probable liability" to his

sums it pays because it believes it is necessary to do so for business, no matter how reasonable the surrounding circumstances.

Carbide contends that Neville did not produce sufficient evidence of the actionable facts so that this aspect of the damages could have been properly submitted to the jury. Accordingly, argues Carbide, judgment should be rendered for Neville on this part of the verdict.

Since Neville was absolved of liability for negligence with regard to the U-171 in its resins, the only liability which Neville could have to its customers is for a breach of warranty. Unless modified or excluded, every seller who is a merchant with respect to goods of that kind warrants that they are of merchantable quality. Section 2-314 of the Uniform Commercial Code.[28] A modification of this implied warranty is effective only if it conforms to the requirements of Section 2-316,[29] and the remedies for its breach can be limited if the contract is consistent with Section 2-719.[30]

▇▇▇ Neville's customers testified that they received a product which was not merchantable because it caused an obnoxious and intolerable odor in the merchandise they manufactured. There is testimony that they ordered the resin from Neville on their own order forms. Since the warranty of merchantability is implied no particular contractual language is necessary to assert it. A contract of sale, however, would appear to be a prerequisite. There is evidence that half the orders Neville received were acknowledged on a form which included a disclaimer of all implied warranties. Carbide points to this and contends that this fact excluded Neville's legal liability to its customers. There

is no determination however whether the disclaimer was part of Neville's contract with its customer or whether the disclaimer was effective under the rules of Section 2-316. There is also evidence that lawsuits were brought or threatened against Neville by some of its customers, and that Neville then settled them on the advice of its attorneys. In view of this evidence, we do not agree with Carbide's request for a directed verdict, but we do consider a new trial necessary on this aspect of Neville's damages.

▇▇▇ Despite the trial court's recognition of the *Martinique* rule, the instructions to the jury did not indicate that Neville could recover from Carbide only those sums paid to Neville's customers for which it was legally liable. Nor was there an instruction to the jury as to the basis on which Neville could have been liable to its customers. Instead the jury was instructed that the plaintiff must establish by a "preponderance of the evidence that such damages or injury were proximately caused by the negligence or failure of Union Carbide to meet its obligations" and that it "could consider and award to Neville those amounts [of the sums paid to customers] which * * * Neville did, in fact pay by check or credit memoranda or otherwise if such payments were made in accordance with reasonable settlements made by Neville in good faith of claims proximately resulting from the odor problem involved in this case." The charge incorrectly emphasized that Neville could be reimbursed for sums "reasonably" and in "good faith" paid to its customers to settle bona fide claims.

▇▇▇ In addition, the jury was incorrectly charged that if Carbide had notice of the existence of the claims against Neville, and that Neville was looking to

---

purchaser. 295 Pa. at 136, 144 A. at 911. In *Wolstenholme Inc.*, the original buyer at the time of suit, had not yet paid the claims asserted against him by his purchasers for a breach of warranty caused by the defective product of the original seller.

28. *See* note 22 *supra.*

29. *See* note 23 *supra.*

30. *See* note 25 *supra.*

Carbide for reimbursement, then the burden of proof shifted to Carbide to show such settlements were not reasonable and not made in good faith to settle bona fide claims. We find no authority for the proposition shifting the burden of proof if notice is given. The *Martinique* rule is to the contrary. 207 Pa. Super. at 409,[31] 217 A.2d at 783.

The jury's verdict in response to the charge does not indicate whether it believed the amounts Neville paid were amounts for which Neville could have been legally liable. In fact without some guidance as to the reason for Neville's liability and the required elements of it, the jury could not have made a reasonable determination.

In addition to finding that Neville was legally liable to its customer for breach of warranty, the jury must also decide whether Neville was legally liable for each type of damage paid by it. For example, certain Neville customers asserted claims for loss of profits because of customer dissatisfaction. Such claims are not legally recoverable in Pennsylvania,[32] and if Neville could not be required to pay them, Carbide obviously could not be compelled to reimburse Neville for doing so.[33]

In calculating the amounts for which Neville could be legally liable it is also necessary to consider the nature of its customers' claims and whether the amounts Neville customers paid in settlements were amounts for which they in turn were legally liable. Because of the complex chain of distribution and complaints, it was particularly important for the jury to have clear instructions on this issue. Although Neville did not have to negate every possible defense against its customers who might proceed against it, it had the burden of establishing the actionable facts on which its liability was predicated and the reasonableness of its settlements.

#### B.

The jury's award of interest on the amounts paid by Neville in settlement of claims against it is not disputed. However, since interest may be awarded only as to those amounts for which Neville was entitled to reimbursement, the interest must be calculated by the jury after its new determination of those amounts.

#### C.

▮ The jury also granted Neville an award of $240,000 of its $281,063 claim for expenses incurred in technical research in discovering the cause of the odor and settlement of customer claims. The expenses for technical research were properly recovered by Neville since they were the proximate result of Carbide's negligence, and there was adequate evidence to sustain the jury's verdict in this regard. These amounts, however, are combined with the amount awarded for expenses incurred in settlement of the claims asserted by Neville's customers. If at a new trial the jury finds that Neville is not entitled to be reimbursed for any or some of its customer settlements the expenses incurred in respect to those particular settlements

---

31. The sole case cited by the Court below on this point is Acro Metalscraft Co. v. Shaw, 364 Pa. 39, 70 A.2d 850 (1950). In *Acro*, the Court said that in certain circumstances the burden of proof shifts, but there is nothing in *Acro* which indicates that the burden of proof shifts to the defendant in this context.

32. See Section D, infra, p. 43.

33. The trial judge cites a number of cases on the question of proof required of an indemnitee against an indemnitor. In each case, however, there was a judicial determination of legal liability of the indemnitee. In Wolstenholme Inc. v. Jos. Randall & Bro., note 26 supra, although the buyer had not yet paid his purchaser there was a judicial determination that he would be liable to do so under a breach of warranty. In Renschler v. Pizano, 329 Pa. 249, 198 A. 33 (1938); City of Philadelphia v. Reading Co., 295 Pa. 183, 145 A. 65 (1929); Wise Shoes, Inc. v. Blatt, 107 Pa.Super. 473, 164 A. 89 (1933); there were judgments existing against the indemnitees.

will also fail. At the new trial, therefore, the jury should be instructed to distinguish between the claims for technical research undertaken to discover the cause of the odor and the settlement expenses incurred in connection with the valid claims asserted against Neville. Carbide will have an opportunity at the retrial on damages to argue that a portion of the legal expenses claimed by Neville was incurred in preparation for the trial of this case rather than in connection with the claims against Neville.

### D.

 Under Pennsylvania law, a plaintiff may not recover for loss of profits to a business because of customer dissatisfaction or loss of good will. Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968); Harry Rubin & Sons, Inc. v. Consolidated Pipe Co. of America, 396 Pa. 506, 153 A.2d 472 (1959); Michelin Tire Co. v. Schulz, 295 Pa. 140, 144, 145 A. 67, 68 (1929).

In *Rubin,* which involved a suit in assumpsit for non-delivery of goods as a result of a breach of contract, a unanimous Pennsylvania Supreme Court refused to award the plaintiff recovery for loss of good will. Justice Benjamin Jones stated:

> "Our research fails to reveal any judicial authority in Pennsylvania which sustains, under the Sales Act, a recovery for a loss of good will occasioned either by nondelivery or by the delivery of defective goods. As this Court stated in Michelin Tire Co. v. Schulz, 295 Pa. 140, 144, 145 A. 67, 68: 'So far as appears, the tires in question were all used by defendant's customers and paid for, so he lost nothing thereon. What he claims is that, because the tires were less durable, than recommended he lost customers, which otherwise he would have retained and whose business would

have netted him a profit * * * This is entirely too speculative and not the proper measure of damages.' There is no indication that the Uniform Commercial Code was intended to enlarge the scope of a buyer's damages to include a loss of good will. In the absence of a specific declaration in this respect, we believe that damages of this nature would be entirely too speculative, * * *"[34] (footnotes omitted) 396 Pa. at 512–513, 153 A.2d at 476.

In *Kassab* the seller and manufacturer of cattle feed were charged with breach of the warranty of merchantability for supplying cattle feed containing harmful chemicals. After deciding that the privity of contract requirement was abolished in implied warranty cases, the Pennsylvania Supreme Court discussed the measure of damages allowable, and said that the loss of value of the buyer's herd was an element of damage but carefully distinguished this type of damage from damages for the future loss of customers by relying specifically on the *Rubin* case. Mr. Justice Roberts stated (432 Pa. at 237 n. 12, 246 A.2d at 857 n. 12):

> "Recovery for the diminution in value of specific property caused by a refusal of the buying community to assign a market value to that property equal to what it was worth prior to its being affected by seller's defective product must not be confused with recovery for loss of good will to a business caused by community knowledge that seller's defective products were once used or sold by that business. Since the loss of good will cannot be measured by the diminution in value of any specific property belonging to the aggrieved buyer, unlike the present case, such good will loss is too speculative and hence not a compensable element of damages under section

---

34. *Rubin* specifically followed the Second Circuit's decision interpreting New York law in refusing to allow recovery for loss of good will in Armstrong Rubber Co. v. Griffith, 43 F.2d 689 (2d Cir. 1930).

The *Rubin* case is noted and criticized as not reflecting the intent of the drafters of the Uniform Commercial Code in Peters, Remedies for Breach of Contracts, 73 Yale L.J. 199, 276–77 (1963).

2–715 of the code. Harry Rubin & Sons, Inc. v. Consolidated Pipe Company of America, Inc., 396 Pa. 506, 153 A.2d 472 (1959)."

Again, no member of the Pennsylvania Supreme Court took exception to this bar against recovery of loss of profits.

The kind of damages disapproved in the above cases are distinguishable from loss of profits caused by inability of a plaintiff to use specific property destroyed, damaged or withheld by a defendant's wrong, and profits lost on the particular sale or contract for the performance of which the goods in question were purchased. *See* 28 A.L.R.2d 591 (1953). It is this latter type of lost profits which were involved in the cases relied on by Neville: Watsontown Brick Co. v. Hercules Powder Co., 387 F.2d 99 (3d Cir.1968) aff'g. 265 F.Supp. 268 (M.D.Pa.1967); Kosco v. Hachmeister Inc., 396 Pa. 288, 152 A.2d 673 (1959); Ashcraft v. C. G. Hussey & Co., 359 Pa. 129, 58 A.2d 170 (1948); Day & Zimmerman, Inc. v. Blocked Iron Corp. of America, 200 F.Supp. 132 (E.D.Pa. 1961); Taylor v. Kaufhold, 368 Pa. 538, 84 A.2d 347, 32 A.L.R.2d 575 (1951); Commonwealth Trust Co. v. Hachmeister Lind Co., 320 Pa. 233, 181 A. 787 (1935); Western Shoe Co. v. Mix, 308 Pa. 215, 162 A. 667 (1932); Macan v. Scandinavia Belting Co., 264 Pa. 384, 107 A. 750, 5 A.L.R. 1502 (1919); Koren v. George, 159 Pa.Super. 182, 48 A.2d 139 (1946).[35]

An illustration of the distinction between the two lines of cases is apparent from an examination of the decisions relied on most heavily by the distinguished trial judge, namely, Western Show v. Mix, and Taylor v. Kaufhold.

In *Western Show*, the performer, Tom Mix, breached his contract to appear in plaintiff's show. Western Show was permitted to recover the profits it would have made had Mix appeared pursuant to his contract commitment. The plaintiff did not recover, or seek to recover, for diminished profits in future years on the basis that the public would not come to see other performances as a result of Tom Mix's failure to appear. The profits awarded in *Western Show* would be equivalent to the profits Neville lost because the resin made with the U–171 was not paid for or was returned.

In Taylor v. Kaufhold the defendant wrongfully retained possession of a restaurant which was being operated, and the plaintiff recovered the profits which would have been made during the period of wrongful detention, rather than the rental value of the premises only. The Court set forth the general rules that:

> "Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provides otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they

35. In all of these cases cited by Neville the lost profits were caused by an inability of the plaintiff to supply customers with goods or services brought about by the defendant's breach of contract or negligence. Thus, in Kosco v. Hachmeister, Inc., the lessee of a hotel was allowed to recover the profit he lost because his hotel was negligently destroyed by the defendant. In Watsontown Brick Co. v. Hercules Powder Co., the plaintiff recovered the profits it lost during the time its plant was out of commission because of a blast caused by the defendant's negligence. In Day & Zimmerman Inc. v. Blocked Iron Corp., recovery was allowed for profits lost through delay in getting a plant into full production as a result of defective performance of a design and construction contract. In Ashcraft v. Hussey & Co., a carpenter-contractor recovered profits he would have made from his trade had defendant not negligently injured him. In Macon v. Scandinavia Belting Co., plaintiff recovered profits which would have been realized from a wrongfully-concluded exclusive sales agency. Gardner v. The Calvert, 253 F.2d 395 (3d Cir. 1958) cert. denied Sound S.S. Lines, Inc. v. Gardner, 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 cited by the trial judge, does not apply Pennsylvania law.

were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3), they can be proved." 368 Pa. at 546, 84 A.2d at 351 (italic omitted).

The later cases, however, make clear that the Pennsylvania courts do not allow recovery for loss of profits resulting from customer dissatisfaction with a plaintiff because the product previously supplied by the defendant was defective. Frequently, the Courts reach this conclusion by saying that this type of damage cannot be ascertained with reasonable certainty. However, regardless of the appropriateness of the language, the results are clear.

Although the *Rubin, Kassab,* and *Michelin* cases involved damage claims for a breach of contract caused either by the nondelivery of goods or by the delivery of defective merchandise which did not involve allegations of negligence, there is also no authority in Pennsylvania allowing recovery for the loss of good will in a *tort* case.

Neville contends that in tort cases less is required in the nature of certainty of damages. For this proposition it relies on a number of antitrust cases: Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Bigelow v. RKO Radio Pictures Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).[36] Neville points out that the first two cases were approved by the Pennsylvania Supreme Court in Commonwealth Trust Co. v. Hachmeister Lind Co.

The *Commonwealth Trust* case does not support Neville's position that there are separate tests of recovery in Pennsylvania in tort as distinguished from contract suits. *Commonwealth Trust* was an action for breach of a contract to manufacture light bulbs and pay royalties to the plaintiff who held a patent on them. The court cited *Story* for the proposition that when there is an intentional or willful wrong the standard for measuring damages can be less definite. However, this general statement has not been used by Pennsylvania courts to award damages for the loss of customer good will in a negligence case. Although *Kassab* and *Rubin* involved breach of warranty only, there is nothing to indicate that future profits or good will will be awarded if goods are defective because of the defendant's negligence. *Kassab* and *Rubin* do not even refer to the *Commonwealth Trust* case, and we cannot assume that *Commonwealth Trust* varies the position of the Pennsylvania Supreme Court nor changes the language it uses that such damages are "entirely too speculative and not the proper measure of damages." 295 Pa. at 144, 145 A. at 68. Whatever the law in other jurisdictions, the strong language in *Rubin* that "in the absence of a specific declaration * * * we believe that damages of this nature would be entirely too speculative," makes it appear that the Pennsylvania courts would not award such damages in this case, solely on the authority of the general language in *Commonwealth Trust.*

This is not to say we approve the Pennsylvania view or believe it will be the Pennsylvania position in the future. Considering the advances made in techniques of market analysis and the use of highly sophisticated computers it may be that lost profits of this nature are no more speculative than lost profits from the destruction of a factory or hotel, and perhaps Pennsylvania will reconsider the reason for its rule in a future case. We are nonetheless required

---

**36.** *Story, Eastman Kodak* and *Bigelow* are federal antitrust cases brought under the Clayton Act. Pennsylvania law was not involved. Neville also cited Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), a combination antitrust and patent pooling case. The rules controlling damages in federal antitrust and patent pooling cases are not Pennsylvania law.

to apply the current rule in Pennsylvania.[37]

The district court's judgment of May 24, 1968, as amended, in favor of Neville against Carbide will be affirmed but that part of such judgment assessing damages will be vacated with directions to the district court to hold a new trial on the damage issue.[38]

---

37. Other courts have recognized the loss of good will or loss of reputation as a recoverable element of plaintiff's damages, and have rejected the claim they are too speculative. *See e. g.* Sol-O-Lite Laminating Corp. v. Allen, 223 Or. 80, 353 P.2d 843 (1960) ; Isenberg v. Lemon, 84 Ariz. 340, 327 P.2d 1016, rehearing 84 Ariz. 364, 329 P.2d 882 (1958); Stott v. Johnston, 36 Cal.2d 864, 229 P.2d 348, 28 A.L.R.2d 580 (1951) ; Royal Paper Box v. Munro and Church Co., 284 Mass. 446, 188 N.E. 223 (1933) ; Barrett Co. v. Panther Rubber Mfg. Co., 24 F.2d 329 (1st Cir. 1938). In Superwood Corp. v. Larson-Stang, Inc., 311 F.2d 735 (8th Cir. 1963), the Court said plaintiff's proof was too speculative even if such damages could be recovered.

38. It may be that a pre-trial conference conducted before the retrial of the damage phase of this case would serve to clarify and simplify the issues to be resolved at such a trial.